Simon A. HERSHON, Appellant,

v.

The HELLMAN COMPANY, INC.,
et al., Appellees.

Nos. 88–464, 88–955.

District of Columbia Court of Appeals.

Argued Sept. 7, 1989.
Decided Sept. 8, 1989.*

Christopher Sanger, Washington, D.C.,
for appellant.

Dennis F. Nee for appellee.

Before FERREN and FARRELL,
Associate Judges, and GALLAGHER,
Senior Judge.

PER CURIAM:

Simon A. Hershon (Hershon) appeals
from a judgment in favor of the Hellman
Company, Inc. (Hellman), the plaintiff in a
breach of contract action in Superior
Court.[1] The case arises from a dispute
over the commission due under a brokerage
agreement, and a later supplement to that
agreement, for the sale of the historic Cen-
tral National Bank Building on the Penn-
sylvania avenue corridor (the "property").
Due to a change in the structure of the sale
after the execution of the brokerage agree-
ment, the parties entered into a new agree-
ment altering the method for computing
the commission. Following a bench trial
the trial court ruled, *inter alia*, that the
new agreement abrogated a paragraph in
the original contract which set a 3% cap on
the total amount of commissions Hershon
would have to pay. We affirm.[2]

Prior to February 22, 1983, the property
was owned by a District of Columbia limit-
ed partnership known as Historic Central

---

* The decision in this case was originally released
as a Memorandum Opinion and Judgment on
September 8, 1989. Appellees' motion for publi-
cation has been granted by the court.

1. The judge orally rendered his findings and
conclusions at the end of the trial on February
17, 1988. These were docketed in written form
on July 6, 1988.

2. Hershon also filed an appeal from the July 6,
1988 order. He argues that the trial court, in
substance, ordered specific performance of the
money judgment, thereby subjecting Hershon to

the possibility of contempt for non-payment in
violation of District of Columbia law. That
appeal is without merit; the order merely re-
flected the court's judgment in favor of Hell-
man, and did not purport to enable Hellman to
enforce the judgment other than by a writ of
execution. We also reject Hershon's argument
that Hellman was only entitled to one half of
the commission because it had agreed to share
its commission with another broker. Even if
this agreement exists, it does not preclude Hell-
man from recovering the entire amount.

National Bank Redevelopment Group ("HCNBRG"), of which Hershon was general partner. On July 1, 1982, HCNBRG, desiring to renovate and sell the property, entered into a written brokerage agreement with Hellman. This agreement provided for a 3% commission on the contract price payable in full within 10 days after the sale was closed. Hellman was required to share this commission with cooperating brokers representing potential buyers. The commission would then be divided as agreed between the two brokers, or, in the absence of an agreement, one half would be paid to each. Under no circumstances, however, would the total amount of the commission owned by Hershon exceed 3% of the fair market value of the property.[3]

After execution of the brokerage agreement, Sears, Roebuck & Co. (Sears) and Hershon entered into a two-part agreement of sale. First, Sears requested that the deal be structured as a sale of the HCNBRG partnership interest rather than of the property. This interest was sold to Sears for $5.5 million.[4] Second, Sears entered into a contract with 633 Joint Venture ("633 JV")[5] to develop the property for another $5.25 million in deferred payments. The deal also required that Sears' agent during the negotiations, Coldwell Banker,[6] be considered a "cooperating broker" and receive $100,000 directly from Hershon. This payment was made when the deal was closed on February 22, 1983.

Since the original brokerage agreement between Hellman and Hershon had not contemplated the structure of the deal with Sears, the parties executed a supplement to this agreement. In a February 22, 1983 letter, Hellman and Hershon agreed to set the amount of the commission due Hellman at $300,000 with $150,000 payable immediately and another $150,000 in deferred payments. These payments were tied to the development contract with Sears and were to be made by Hershon as he received payment from Sears. Hershon made the initial payment and another $116,400 in eleven separate payments. Hellman brought suit for the balance. Hershon argued that pursuant to the original brokerage agreement, he was liable for a maximum of 3% of the sale price in commissions. He contended that Hellman had already been paid $43,900 more than he was due under the agreement, and counterclaimed for that amount.[7]

The trial court concluded that the parties intended to be bound by the February 22, 1983 letter, and that the letter modified the earlier brokerage agreement by abrogating those sections fixing the amount of the commission and setting a 3% cap on Hershon's liability. The court therefore awarded Hellman $33,600 and denied Hershon's counterclaim.

 The parties to a contract are free to modify that contract by mutual consent. *Nyhus v. Travel Management Corporation,* 151 U.S. App.D.C. 269, 275, 466 F.2d 440, 445 (1972) (power to contract is power to modify); *see also Egan v. McNamara,* 467 A.2d 733 (D.C.1983); 15 S. Williston, A Treatise on the Law of Contracts § 1826 (3d ed.1972). In order to be valid, however, the modification must possess the same elements of consideration as necessary for normal contract formation. *Nyhus, supra,* 151 U.S. App.D.C. at 275, 466

3. Paragraph 2(h) of the agreement provided that "in no event shall the aggregate of the commissions ... exceed three percent (3%) of the fair market value of the property...."

4. The HCNBRG partnership interest was sold by Simon A. Hershon, Gibraltar Services Corporation, a Maryland corporation, and Hershon and Company, Inc., a District of Columbia corporation.

5. 633 JV is a District of Columbia partnership composed of Simon A. Hershon and Hershon &

Company, Inc., a corporation controlled by Hershon.

6. Coldwell Banker was fully owned by Sears at the time of this transaction.

7. As structured, the deal with Sears amounted to a total of $10.75 million. Citing the 3% limit on commissions, Hershon contended that his liability could not exceed $322,500. Since Coldwell had already been paid $100,000, Hellman should have received a maximum of $222,500 instead of the $266,400 already paid.

F.2d at 445; WILLISTON, *supra*, at § 1826. The February 22, 1983 agreement altered the existing brokerage contract so that Hershon was now obligated to pay a total of $400,000[8] in commissions rather than the $322,500 required by the 3% provision in the original contract. Hellman, on the other hand, agreed to accept less than the full amount at the closing and to receive the balance in deferred payments only as Hershon received them from Sears.[9] Thus, valid consideration existed on both sides. The trial court properly concluded, therefore, that the February 22, 1983 letter constituted an enforceable contract which modified the original agreement.

■■■ The trial court was also correct in concluding that the new agreement nullified the 3% cap on Hershon's liability for commissions. This court has held that a contract "containing a term inconsistent with a term of an earlier contract between the same parties, regarding the same subject matter, should be interpreted to rescind the inconsistent term in the earlier contract." *Egan, supra*, 467 A.2d at 740; *see also* WILLISTON, *supra*, at § 1826. The new agreement to pay Hellman a $300,000 commission was clearly inconsistent with the original method for determining the commission, *i.e.* 3% of the fair market value. Further, since Hershon, at the time the modification was signed, was already

obligated to pay the $100,000 commission to Coldwell,[10] the additional $300,000 obligation to Hellman was inconsistent with the 3% cap.

Given these inconsistent provisions, the trial court properly interpreted the modification as abrogating the affected parts of the prior agreement.[11] When a case is tried without a jury, we "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305 (1981); *see Auxier v. Kraisel*, 466 A.2d 416, 418 (D.C. 1983). Our review of the record leads us to conclude that the trial court did not err in its interpretation of the later agreement. Further, the court's findings as to the intent of the parties derive support from the evidence, *see Edison v. Scott*, 388 A.2d 1239, 1243 (D.C.1978), and thus are not "clearly erroneous." Super.Ct.Civ.R. 52(a).

Accordingly, the judgment on appeal is

*Affirmed.*

8. When the new agreement was signed, Hershon, as worked out in prior discussions among Hellman, Hershon, and Sears, was already liable for a $100,000 commission to Coldwell. When added to the $300,000 commission to Hellman, Hershon was obligated to pay a total of $400,000.

9. Moreover, it is not unreasonable to assume that the sale price agreed upon between Hershon and Sears, on which the original 3% commission would have been based, took account of the fact that Hershon was paying $100,000 in commission to Coldwell Banker, a wholly owned subsidiary of Sears.

10. This $100,000 payment was worked out as a compromise between Sears, Hellman, and Hershon and was made contemporaneously with

the initial $150,000 to Hellman. Sears had insisted that Coldwell be considered a cooperating broker and receive a commission on the sale. Hellman had resisted this suggestion.

11. Hershon relies on the fact that the February 22, 1983 letter expressly stated that it would "serve as a supplement to [the] Brokerage Agreement" and incorporated the prior agreement therein. This language without more, however, is obviously insufficient to overcome application of the principle that a later inconsistent term in a contract modification serves to indicate the parties' intent to rescind the relevant term in the earlier agreement. Hershon does not even attempt to explain how the later stipulation of a $300,000 commission could be reconciled logically with the earlier 3% limitation.