Richard REIMAN, d/b/a Reiman
& Co., Appellant,

v.

INTERNATIONAL HOSPITALITY
GROUP, LTD., et al.,
Appellees.

Bromley SMITH, Jr., et al., Appellants,

v.

Richard REIMAN d/b/a Reiman
& Co., Appellee.

Nos. 90–CV–248, 90–CV–271.

District of Columbia Court of Appeals.

Argued Feb. 11, 1991.
Decided Sept. 29, 1992.

Dwight D. Meier, with whom David B. Tatge and David S. Greene, Washington,

D.C., were on the brief, for Richard Reiman d/b/a Reiman & Co.

Daniel S. Koch, Washington, D.C., with whom W. John McNally, III, Norwich, Vt., was on the brief, for Intern. Hospitality Group, Ltd., et al.

Daniel Schumack and Ben Cotten, Washington, D.C., filed a brief for Bromley Smith, Jr.

Before STEADMAN and WAGNER, Associate Judges, and KERN, Senior Judge.

STEADMAN, Associate Judge:

Appellant Richard Reiman, a real estate broker, seeks to recover a $250,000 brokerage fee in a long-running legal action begun in September 1983. The case is now before us for a second time. Following a prior appeal to this court and remand for a new trial, *Reiman v. Int'l Hospitality Group*, 558 A.2d 1128 (D.C.1989) (*Reiman I*), the trial court in a bench trial granted judgment in favor of Reiman against International Hospitality Group, Ltd., a Maryland corporation, ("IHG"),[1] its wholly-owned subsidiary Somers Holdings, Inc., a District of Columbia corporation, ("Somers"), and Bromley Smith, individually. Smith's liability was based on the theory that he had held himself out as a general partner of 4400 Connecticut Avenue Associates ("CAA"), a District of Columbia limited partnership.[2]

Reiman appeals the refusal of the trial court to hold liable appellee Henry Lieberman on the theory that he too incurred liability as a partner of CAA due to the late filing of the certificate of limited partnership. The two corporate defendants and Smith cross-appeal, challenging the sufficiency of the evidence to support the trial court finding of anticipatory breach. We hold the evidence sufficient to support the judgment against the corporate defendants and Smith. However, we remand for further proceedings on the issue of Lieberman's liability.

## I

Many of the pertinent facts, which we summarize here, were set forth in our prior opinion. 558 A.2d at 1129–31. In 1981, Reiman, a licensed D.C. real estate broker, entered into an agreement with Bruce Lyons, the managing partner of Connecticut Inn Partnership ("CIP"), which owned the Connecticut Inn Motel, to market the motel. Their understanding was that Reiman would receive a $200,000 commission at closing. Reiman thereupon began to market the motel and interested IHG in it. Lieberman was the president and Smith the senior vice-president of IHG.

On September 3, 1982, IHG and CIP executed a letter of intent[3] to purchase the motel "on behalf of a partnership to be formed." On November 16, 1982, a formal, 20–page purchase agreement was entered into between CIP and "4400 Connecticut Avenue Associates, a District of Columbia limited partnership," which Bromley Smith signed as "General Partner" of CAA. Under that agreement, as supplemented, CAA[4] agreed to pay Reiman a total commission of $250,000, including the $200,000 for which CIP was obligated.[5]

In fact, difficulties developed and the contemplated transaction never went through. CIP claimed that at a climactic meeting on January 17, 1983, the purchaser had "anticipatorily breached" the agreement. As a consequence, CIP put the motel back on the market on January 20. In

1. The name of this corporation was subsequently changed to Brookshire Hotels, Ltd.

2. Although in its original judgment the trial court granted judgment for Smith, the court reversed its position following Reiman's motion for reconsideration.

3. The letter was executed on behalf of IHG by Lieberman and Smith.

4. Our prior opinion referred to IHG and the other appellees collectively as IHG. 558 A.2d at 1129 n. 1. While the opinion states that IHG assumed CIP's $200,000 obligation and separately agreed to pay an additional $50,000, it appears that formally CAA through Smith signed the relevant documents.

5. The purchase price set forth in the letter of intent was reduced by $200,000 to reflect this assumption of obligation, which was tax-related.

November 1983, the motel was sold to another buyer.

Reiman brought suit for his commission in September 1983. The trial court in the first trial found for the defendants, on the ground that the commission agreements provided for payment only if the purchase was consummated. On appeal, we reversed, holding that Reiman might recover if he could show that the defendants [6] made occurrence of the closing impossible through their own fault or misconduct.

On the retrial, the trial court found that the corporate defendants had anticipatorily breached the purchase agreement and therefore made it impossible to perform. Consequently, it entered judgment in favor of Reiman for the claimed commission.[7] It subsequently also entered judgment against Smith as general partner of CAA, the signatory to the purchase agreement and to the other commission documents, but refused to hold Lieberman liable.[8] From this judgment, Reiman and the defendants cross-appeal.

## II

■ We first address the defendants' argument that the trial court erroneously found that an anticipatory breach of the contract to purchase the motel occurred at the January 17 meeting with CIP. They proceed from the correct premise that "[f]or a repudiation of a contract by one party to be sufficient to give the other party the right to recover for breach, the repudiating party must have communicated, by word or conduct, unequivocally and positively its intention not to perform." *Order of AHEPA v. Travel Consultants,*

*Inc.,* 367 A.2d 119, 125 (D.C.1976), *cert. dismissed,* 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977). *See also Ingber v. Ross,* 479 A.2d 1256, 1262–63 (D.C.1984); *Burke v. Thomas J. Fisher & Co.,* 127 F.Supp. 1 (D.D.C.1953), *aff'd,* 95 U.S.App.D.C. 85, 219 F.2d 767 (1955); 4 CORBIN ON CONTRACTS § 973 (1951). They then contend in substance that Lyons had invited them to propose changes in the deal and that at the January 17 meeting they had offered modifications to the contract which did not communicate "unequivocally" their intention to not perform.

The trial court made extensive oral findings on the issue of breach. It noted that when executing the purchase agreement, the purchasers "were very well aware of the financial situation of the Connecticut Inn," and took steps "to cover themselves in the event of problems arising," anticipated or unanticipated. It also found that the settlement date was extended by mutual agreement to January 17, at which time a new payment schedule and closing date would be discussed as indicated by the letter of January 13 sent to CIP by the purchasers' attorney. The court specifically rejected the defendants' argument that Lyons had invited the purchasers to propose new conditions precedent or alter the purchase price.

The court further found that at the meeting on January 17, Conrad Cafritz, representing the buyers, in effect presented an all-or-nothing, "take-it-or-leave-it" markedly modified proposal to CIP. *Inter alia,* the purchase price was to be effectively reduced by $350,000 and a lease with the University of the District of Columbia was to be a condition precedent to their pur-

6. Our prior opinion treated IHG as the effective purchaser and a responsible party, although the formal document was signed by Smith as general partner of CAA. The partnership issue now before us was not an issue on the prior appeal. IHG and Somers appeal, as does Smith, on the sole ground that an anticipatory breach has not been proven, and we therefore have no occasion to explore the formal basis for their liability to Reiman.

7. The judgment was for not only the principal amount of $250,000 but also, pursuant to the agreement, interest at the rate of 12½%.

8. The trial court, without explanation, did not enter judgment against CAA, presumably because of the doctrine that a partnership as such cannot be the subject of a suit. *Lenkin v. Beckman,* 575 A.2d 273, 277–78 (D.C.1990). The Uniform Limited Partnership Act did not affect this doctrine, although limited partners are not proper parties except under certain circumstances. D.C.Code § 41–226 (1986); *Conroy v. Winn,* 581 F.Supp. 1280, 1281 & n. 3 (D.D.C. 1984).

chase of the motel. It was "more in the statement of a mandate: This is the new deal; only if the deal goes down this way can it conclude." Looking also at other documents presented into evidence prepared around the time of the crucial meeting, the court stated: "[W]hat I conclude happened at the January 17 meeting ... was an entirely new deal. It repudiated the old contract. They were not going to go forward on that basis."

Anticipatory repudiation is not something to be lightly inferred in the rugged give-and-take of the marketplace. However, the trial court here after a lengthy trial made careful and thorough findings of fact. Such findings are binding upon an appellate court unless clearly erroneous or without support in the record. D.C.Code § 17–305(a) (1989); *see Hershon v. Hellman Co.*, 565 A.2d 282, 284 (D.C.1989). We perceive no basis for reversal on this ground here.

### III

The remaining issue is whether Lieberman is individually liable. This issue arises because when the purchase agreement was executed on November 16, 1982, no formal steps had been taken to create CAA as a limited partnership under the then-operative District of Columbia version of the Uniform Limited Partnership Act ("ULPA"), D.C.Code § 41–201 *et seq.* (1986).[9] The relevant provision read:

§ 41–202. Procedure for formation; filing and recordation of certificate.

(a) Two or more persons desiring to form a limited partnership shall:

(1) Sign and swear to a certificate, which shall state: [14 requirements listed]

(2) File for record the certificate in the Office of the Recorder of Deeds of the District of Columbia.

(b) A limited partnership is formed if there has been substantial compliance in good faith with the requirements of subsection (a) of this section.

On December 1, 1982, a limited partnership certificate for CAA was signed, pursuant to § 41–202(a)(1), showing Somers Holdings, Inc., a wholly-owned subsidiary of IHG, as general partner and Smith, Lieberman and Richard Bromley, another IHG executive, as limited partners. However, this limited partnership certificate was not filed with the Recorder of Deeds until January 19, 1983, two days after the anticipatory breach. *Inter alia*, the certificate provided: "The term of the partnership shall commence on the date of the filing of this Certificate of Limited Partnership...."

The trial court found no basis for holding Lieberman individually liable. It took as its starting point the proposition that the "relevant time for establishing the existence and identity of the purported general partnership for purposes of liability is the day of the execution of the contract." From this premise it first noted that on November 16, not even a certificate of partnership had been executed, a prerequisite to the creation of an effective limited partnership under D.C.Code § 41–202(a); "thus, it follows that general partnership liability could not attach [as a matter of law] for failure to take the second step [recordation of the certificate]." Second, examining the question whether Lieberman and Smith intended in fact to form a general partnership, the court concluded from the evidence that on November 16, "Lieberman and Smith intended to form a limited partnership, not a general partnership." Accordingly, the court found no basis to impose liability upon Lieberman.

---

**9.** The crucial protection provided by proper limited partner status was that "[a] limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business." D.C.Code § 41–207 (1986).

The ULPA was drafted in 1916 and subsequently adopted by almost all states, plus the Virgin Islands and the District of Columbia. A Revised Uniform Limited Partnership Act was drafted by the Commissioners on Uniform State Laws in 1976, with amendments in 1985. The 1976 revision, with certain modifications, was adopted by the District in 1987 and now appears as D.C.Code § 41–401 et seq. (1990).

No cases are extant in this jurisdiction in which a purported limited partnership had undertaken to act as a partnership without full compliance with the statutory requirements for establishing a limited partnership.[10] We think the trial court, in the absence of such guidance, stopped short in its analysis.

### A

Limited partnerships were unknown to the common law and are entirely the creatures of statute. From their earliest inception, in New York and Connecticut in 1822, limited partnership statutes, being in derogation of the common law, were strictly construed. The view was commonly taken that a special or limited partner was essentially a general partner, with immunity from personal liability only on condition of full and exact compliance with the statutory requirements as to the details of formation of the association. *See Rathke v. Griffith,* 36 Wash.2d 394, 218 P.2d 757 (1950).

One of the express purposes of the ULPA was to mitigate the rigor of this principle. Thus, the drafters listed as the third of the seven assumptions upon which the ULPA was drafted that "[t]he limited partner not being in any sense a principal in the business, failure to comply with the requirements of the act in respect to the certificate, while it may result in the nonformation of the association, does not make him a partner or liable as such. The exact nature of his [li]ability in such cases is set forth in Sec. 11."[11]

That Section 11, which appears as D.C.Code § 41–211, reads:

A person who has contributed to the capital of a business conducted by a person or partnership erroneously believing that he has become a limited partner in a limited partnership is not, by reason of this exercise of the rights of a limited partner, a general partner with the person or in the partnership carrying on the business, or bound by the obligations of such person or partnership; Provided, that on ascertaining the mistake he promptly renounces his interest in the profits of the business, or other compensation by way of income.

 Thus, it is no longer correct to say that any individual associated with a purported limited partnership where the proper formalities have not been complied with is necessarily as a matter of law liable as a general partner. As cases have recognized, compliance with Section 11 "promptly" after the discovery of a mistake will prevent any general partner liability from being imposed upon the putative limited partner. *See, e.g., Giles v. Vette,* 263 U.S. 553, 563, 44 S.Ct. 157, 161, 68 L.Ed. 441 (1924) ("Section 11 is broad and highly remedial"); *Voudouris v. Walter Heller & Co.,* 560 S.W.2d 202, 206–07 (Tex.Civ.App. 1977) (citing *United States v. Coson,* 286 F.2d 453 (9th Cir.1961)); *Graybar Elec. Co. v. Lowe,* 11 Ariz.App. 116, 462 P.2d 413 (1969); *Rathke v. Griffith, supra,* 218 P.2d at 760–61. The converse of Section 11, however, and implicit in its language, as these decisions in part suggest, is that if such a renunciation is not effectuated and no other section of the ULPA provides protection,[12] the putative limited partner faces liability in an individual capacity for debts of the partnership.[13] Having discov-

---

**10.** This is true although the popularity of the limited partnership form of association is demonstrated by the fact that as of 1986, there were some 11,000 limited partnership certificates on file in the District of Columbia alone. Report of the Committee on Consumer and Regulatory Affairs of the Council of the District of Columbia on Bill 7–227, "Uniform Limited Partnership Act of 1987" 4 (June 23, 1987).

**11.** ULPA § 1 Official Comment, 6 U.L.A. 563, 564 (1969).

**12.** The most important additional protection in the Act, indeed the key protection, is the provi-

sion dealing in part with "substantial compliance" with the formalities, discussed *infra.* D.C.Code § 41–202(b) (1986). *See also* D.C.Code §§ 41–206 and –225 (1986), dealing in part with actions a limited partner may take when he learns of a false statement in the certificate as filed.

**13.** We note the absence here of any strong countervailing equitable considerations, such as might be the situation of entirely passive good faith individual investors who play no other part in the putative limited partnership. *Cf., e.g., Blow v. Shaughnessy,* 68 N.C.App. 1, 313

ered the problem, he may not continue to hope to reap whatever benefits the association may otherwise entitle him to.[14] The doctrine that a putative limited partner in a defective limited partnership under the ULPA runs the risk of individual liability may be found set forth in a number of cases. As a neighbor federal circuit court starkly summarized the situation: "It is well settled that to obtain the protections and privileges of limited liability a person must comply with the statutory requirements regulating the formation of limited partnerships or otherwise be held liable as a general partner." *Filesi v. United States*, 352 F.2d 339, 341 (4th Cir.1965). *See also, e.g., Vidricksen v. Grover*, 363 F.2d 372 (9th Cir.1966); *Deporter–Butterworth Tours, Inc. v. Tyrrell*, 151 Ill.App.3d 949, 104 Ill.Dec. 821, 503 N.E.2d 378 *appeal denied*, 115 Ill.2d 539, 110 Ill.Dec. 455, 511 N.E.2d 427 (1987); *Dwinell's Central Neon v. Cosmopolitan Chinook Hotel*, 21 Wash.App. 929, 587 P.2d 191 (1978), *review denied*, 92 Wash. 1009 (1979).

### B

Lieberman invokes the section of the ULPA, quoted above as D.C.Code § 41–202(b) (1986), providing that a limited partnership is formed if there has been "substantial compliance in good faith" with the formal requirements. He invokes a line of cases which hold that the filing of the certificate within a "reasonable time" constitutes "substantial compliance" and has retroactive effect to activities undertaken by the partnership prior to the filing. *See,*

*e.g., Fabry Partnership v. Christensen*, 106 Nev. 422, 794 P.2d 719, 720–21 (1990) (per curiam); *Franklin v. Rigg*, 143 Ga. App. 60, 237 S.E.2d 526 (1977).

■ The filing of the certificate is, however, a crucial statutory step.[15] We think analogous law in this jurisdiction impels us to follow a competing line of contrary cases, which hold that protection under the ULPA begins only from the time of the filing of the certificate. *See Deporter–Butterworth Tours, Inc. v. Tyrrell*, 151 Ill.App.3d 949, 104 Ill.Dec. 821, 503 N.E.2d 378 *appeal denied*, 115 Ill.2d 539, 110 Ill. Dec. 455, 511 N.E.2d 427 (1987); *Dwinnell's Central Neon v. Cosmopolitan Chinook Hotel*, 21 Wash.App. 929, 587 P.2d 191 (1978), *review denied*, 92 Wash. 1009 (1979).[16]

An analogy may be found in the law relating to the consequences of failure to properly form a valid corporation. In *Robertson v. Levy*, 197 A.2d 443 (D.C.1964), the defendant purported to enter into a contract on behalf of a corporation after the articles of incorporation had been filed but two weeks before the certificate of incorporation was issued. Interpreting our statute, we rejected any concept of de facto corporation and held the defendant personally liable even though the other contracting party thought he was dealing with the corporation and accepted one payment on the note in the corporate name. *Id.* at 446–47.

"Again, suppose a person is asked to contribute to the capital of a business conducted by a person or partnership, and that he does so, believing he has become a limited partner, but the certificate required to be filed is not filed.... Section 11 of the Uniform Act meets this situation...." William Draper Lewis, The Uniform Limited Partnership Act, 65 U.Pa.L.Rev. 715, 723–24 (1917). Mr. Lewis was the chairman of the committee that drafted the ULPA.

S.E.2d 868 *review denied*, 311 N.C. 751, 321 S.E.2d 127 (1984). See note 19 *infra*.

**14.** It is the renunciation of future, not past, profits that is the key. *Gilman Paint & Varnish Co. v. Legum*, 197 Md. 665, 80 A.2d 906, 910 (1951).

Under the 1987 Act, a person discovering an error may avoid liability and remain in the partnership by effectuating a filing of a proper certificate, an option not existing under the old law. D.C.Code § 41–434(a)(1) (1990).

**15.** "Reading ULPA §§ 2(2) and 11 together indicates that the latter is intended to operate mainly when no certificate has been filed or only a grossly defective one." Judson A. Crane & Alan R. Bromberg, Law of Partnership 165 n. 51 (1968).

**16.** Even *Blow v. Shaughnessy, supra* note 13, 313 S.E.2d at 878, invoked to support nonliability, see note 19 *supra,* acknowledges that "[i]t is generally held that a failure to file a certificate of limited partnership is a failure of 'substantial compliance' such that any assertion of limited partnership is negated."

We note also that the Revised ULPA, see note 9 *supra,* in the form adopted and now in force here, necessarily rejects the concept that a filing can have retroactive effect as to all limited partners. D.C.Code § 41–434(b) (1990) specifically provides that a person who erroneously believes he or she has become a limited partner is nonetheless "liable as a general partner ... (1) If that person knew or reasonably should have known either that no certificate has been filed to show that he or she is not a general partner...."[17] This provision is not found in the standard Revised ULPA but was apparently included as part of the modifications recommended by the D.C. Bar. *See* REPORT, *supra* note 10, at 4. While the 1987 Act cannot, of course, control events here,[18] it is nonetheless illustrative of the importance accorded here to the filing of the certificate.

**C**

This history and the wording of Section 11 itself make it plain that one is not absolved from any potential liability simply because one intended only to be a limited partner. The very purpose of the several provisions quoted above of both the ULPA and the Revised ULPA is to deal with the exact situation where a person indeed intends to be no more than a limited partner but for some reason or other the requisite formalities to confer that status are lacking. Thus, the trial court stopped too soon when it absolved Lieberman from liability simply because no certificate of partnership had been prepared and Lieberman had no intent to enter anything other than a limited partnership.

However, liability flowing solely from a status as a putative limited partner is not to be lightly imposed. One cannot be subject to liability in that capacity alone, apart from any representations or appearances relied upon by a creditor, until and unless one has taken steps to establish himself as a limited partner and has clearly bound himself in that capacity and the obligation at issue is clearly of that particular partnership. As Lieberman correctly points out, the burden of proof is on Reiman to establish the basis for liability. *See Banze v. American Int'l Exports, Inc.,* 454 A.2d 816, 817 (D.C.1983); *see also Klein v. Weiss,* 284 Md. 36, 395 A.2d 126, 141 (1978); *Kintz v. Read,* 28 Wash.App. 731, 626 P.2d 52, 55 (1981).

We do not think that the agreement to be so bound is absolutely dependent upon the execution of a certificate of partnership.[19] *See Cooper v. Saunders–Hunt,*

---

**17.** The section in its entirety reads:

(a) Except as provided in subsection (b) of this section, a person who makes a contribution to a partnership and erroneously but in good faith believes that he or she has become a limited partner in the partnership is not a general partner in the partnership and is not bound by its obligations by reason of making the contribution, receiving distributions from the partnership, or exercising any rights of a general [so in original: should read "limited"] partner, if, on ascertaining the mistake:

(1) In the case of a person who wishes to be a limited partner, he or she causes an appropriate certificate to be executed and filed to show that he or she is not a general partner; or

(2) In the case of a person who wishes to withdraw as a partner from the partnership, he or she executes and files a document with the Department declaring that he or she withdraws under this section.

(b) A person who makes a contribution under the circumstances described in subsection (a) of this section is liable as a general partner to any 3rd party who transacts business with the partnership prior to the occurrence of either of the events described in subsection (a)(1) or (a)(2) of this section:

(1) If that person knew or reasonably should have known either that no certificate has been filed to show that he or she is not a general partner or that the certificate inaccurately refers to him or her as a general partner; or

(2) If the 3rd party reasonably relied upon the fact that the person was a general partner at the time of the transaction.

**18.** Reiman suggests that perhaps the 1987 Act should apply, in light of D.C.Code § 41–499.25 (1990), which provides that all existing limited partnerships formed under the ULPA shall, on and after December 10, 1987, be governed by the provisions of the new Act. It is untenable, however, that the new Act could be construed to impose liability upon a person not liable under the law existing at the time the alleged obligation arose.

**19.** We do not read *Blow v. Shaughnessy, supra* note 13, 313 S.E.2d at 878–79, as setting forth a per se rule that liability can in no event ensue

365 A.2d 626, 628 (D.C.1976); *Ruth v. Crane*, 392 F.Supp. 724, 734 (E.D.Pa.1975), *aff'd*, 564 F.2d 90 (3d Cir.1977). That certificate is not the partnership agreement itself but rather the document which must be recorded in order to secure uncontestable limited liability.[20] *See Heritage Hills v. Zion's First Nat'l Bank*, 601 F.2d 1023, 1025–26 (9th Cir.1979) (putative limited partnership prior to filing of certificate existed as business entity, with all partners having general liability). The very concept of putative limited partnership postulates a defect of one sort or another in creation of an effective limited partnership.

■ However, an abstract intent to be a limited partner is not enough, much less an intent to become a limited partner at some undesignated point in the future. *See Klein v. Weiss, supra*, 395 A.2d at 141 ("An agreement to form a partnership may be made by the parties but such an agreement does not of itself create a partnership."). As the commentary to the ULPA makes clear, the purpose of a limited partnership is to provide a mechanism for a person to contribute to the capital of a business without being bound for the obligations of the business. ULPA § 1, 6 U.L.A. 562–65 (1969). In that regard, limited partner status resembles the status of shareholders in a modern corporation, although the limited partnership form of association may have advantages for certain business purposes. *See* Lewis, *supra* note 15, 65 U.Pa.L.Rev. at 717–18. The key, however, under the ULPA is contribution of capital: "The contribution of a limited partner may be cash or other property, but not services." D.C.Code § 41–204 (1986).[21] Indeed, Section 11 of the ULPA itself, dealing with the status of a person erroneously believing himself a limited partner, speaks

to "[a] person who has contributed to the capital of a business conducted by a person or partnership...." D.C.Code § 41–211 (1986).

■ This then is an important, if not indispensable, concrete step to create such a clear establishment of limited partner status to justify the imposition of liability on that basis alone under Section 11, which covers "the exact nature of his liability." See note 11 *supra*. Absent such a contribution of capital or at least the entry into an enforceable agreement to make such a contribution, D.C.Code § 41–217(a) (1986), no liability should accrue based solely upon one's status as a putative limited partner. This reading of Section 11, while not explicit, seems a necessary corollary of its language and is consistent with the fact that cases imposing unlimited liability on a putative limited partner on that basis alone in the main involve a functioning and on-going business enterprise in which the person sought to be held liable has a clear stake.

■ The time periods involved are also relevant. Focus cannot necessarily be confined to the date of the execution of the contract. It is, of course, true that a person's liability as a putative limited partner can relate only to obligations of the specific limited partnership of which he is putatively a member and not any other partnership, even if it bears the same name. However, obligations, like assets, may be transferred from entity to entity, perhaps with express assumption. *See Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1097–1100 (D.C.1988). Thus, the defective creation of a limited partnership which assumes or receives by assignment or otherwise pre-existing benefits and burdens may also create liability

---

on a theory of a putative limited partnership alone any earlier than the execution of the statutory certificate. Rather, it makes the determination that, on its particular facts, the putative limited partners were not bound by an unauthorized arbitration agreement.

The question of Lieberman's precise and perhaps unfolding intent may require a determination whether his actions during the various stages of the transaction were in his individual capacity or in his capacity as an officer of IHS.

20. One of the purposes of the Revised ULPA was to "clearly delineate" the time at which parties become partners, something not explicit in the ULPA. See official comment to sec. 201(b), (D.C.Code § 41–421(b)).

21. This is not true under the Revised ULPA, which permits a limited partner to contribute services. D.C.Code § 41–451 (1990).

for a putative limited partner under the principles mentioned above.[22]

Furthermore, partnerships may continue with the addition of new partners. In this regard, D.C.Code § 41–116 could come into play.[23] The section, however, would seem to bear on limiting Lieberman's liability only if he was not a putative member of the partnership when the anticipatory repudiation occurred. We agree with the analysis and case law that distinguishes executed portions of contractual liability from executory portions, as to which both burdens and benefits accrue to the new partner, particularly where, as apparently true here, the contingent obligation became fixed only through an act of the partnership itself. See II ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP § 7.18(b) (1991) and cases cited. As *Reiman I* established, the obligation to pay Reiman's commissions was here subject to the condition precedent of a closing, with liability in fact arising only because of the prevention doctrine. Thus, for purposes of § 41–114, it appears that the "obligation to pay Reiman's commissions arose when [the purchaser] prevented the closing under the purchase agreement that it had with CIP." 558 A.2d at 1134 n. 6.

**22.** Reiman, for example, argues that regardless of the November 16 events, CAA subsequently "adopted" the commission obligations.

**23.** That section of the Uniform Partnership Act reads: "A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when such obligations were incurred, except that the liability shall be satisfied only out of partnership property." *See also* D.C.Code § 41–140(g).

**24.** Lieberman argues that a putative limited partner may never incur liability absent reliance by the creditor on general partner status. However, reliance is not mentioned in Section 11 of the ULPA. The cases imposing liability generally do not turn on this consideration, although in certain circumstances it could be relevant. See notes 13 and 25. D.C.Code § 41–434(b) (1990), discussed *supra,* includes a ground for liability (knowledge of nonfiling) apart from any reliance. Lieberman's brief itself acknowledges that "some older cases reject

We speak here of liability attempted to be imposed solely because of one's status as a putative limited partner.[24] If a representation has been made that one is a partner upon which a creditor has relied or at least had knowledge, different considerations may come into play based upon principles of estoppel, akin to the rationale upon which the trial court correctly imposed liability upon Smith. The Uniform Partnership Act's Section 16, D.C.Code § 41–115 (1990), deals with the liability of a person who represents himself as a partner in an existing partnership, and the Uniform Partnership Act applies to limited partnerships "except insofar as the statutes of the District of Columbia relating to such partnerships are inconsistent herewith." D.C.Code § 41–105 (1986).[25]

## D

The application of the foregoing principles to any specific set of circumstances is dependent upon resolution of intensely factual questions, on which the trial court's determination is generally binding unless plainly wrong or without support in the record. D.C.Code § 17–305(a) (1989); *Hershon v. Hellman Co.,* 565 A.2d 282, 284 (D.C.1989). Here the trial court relied on the erroneous legal premise that the ab-

reliance as an element," citing *Tiburon Nat'l Bank v. Wagner,* 265 Cal.App.2d 868, 71 Cal. Rptr. 832 (1968), and cites no contrary authority. In addition to *Tiburon, see Delaney v. Fidelity Lease Ltd.,* 526 S.W.2d 543 (Tex.1975); *Dwinnell's Central Neon v. Cosmopolitan Chinook Hotel, supra.*

**25.** Such reliance must, however, be significant. *See Giles v. Vette,* 263 U.S. 553, 561, 44 S.Ct. 157, 160, 68 L.Ed. 441 (1924), where the Supreme Court held that since no representation of general liability by the limited partners had been made to any person or to the public, and the limited partners did not agree or intend to become general partners, "[t]o hold them liable as general partners would give creditors what they are not entitled to have and would impose on [the limited partners] burdens that are not theirs to bear." In that case, however, the limited partners had complied with the requirements of Section 11 of the ULPA, which the Court found to be "broad and highly remedial" extending to all limited partnerships and not just those formed under the ULPA. *Id.* at 563, 44 S.Ct. at 161.

sence of an executed certificate of partnership at the time of the execution of the purchase agreement, coupled with Lieberman's intent to enter into no more than a limited partnership, was determinative on the issue of his liability. It thus had no occasion to examine the full factual contours of potential liability *vel non* which the law as expounded above requires.[26]

Accordingly, we vacate the judgment in favor of Lieberman and remand the case for further consideration on the issue of his liability. The judgment against the two corporate defendants and Smith is affirmed.

*So ordered.*

---

**26.** For example, there is ambiguity even in the trial court's finding that Lieberman "intended to form a limited partnership." It is not clear whether Lieberman intended to be a limited partner in the CAA on the date the agreement was signed or only at some later point. No findings exist as to when, where, or how Lieberman took concrete steps to become a limited partner, including a capital contribution, nor as to what knowledge Reiman had of Lieberman's intent or status with respect to the putative limited partnership at any given point in the proceedings, and indeed what that intent and status in fact was. It may also be relevant whether an imputed partnership arose by agreement or by actions of the parties. No findings exist as to whether the CAA which signed the agreement was, strictly speaking, the same entity as that which was the subject of the December 1 certificate or which at least formally came into being on January 19, nor as to the intended meaning of the provisions of the certificate nor, more generally, what precise entity was at each relevant point in time vested with the rights and obligations under the commission agreements and Lieberman's relation thereto. Likewise, Lieberman's arguments raised on appeal with respect to the effect of the pretrial stipulation and other allegedly ignored evidence of "partner" status were not necessarily before the trial court for determination. Whether findings are needed on the above or other matters and whether any further evidentiary proceedings are called for will of course depend on the course of the trial court's analysis on remand.