Ulysses G. AUGER, Appellant,

v.

TASEA INVESTMENT COMPANY, Appellee.

No. 94–CV–1654.

District of Columbia Court of Appeals.

Argued Jan. 30, 1996.

Decided May 16, 1996.

John J. Brennan, III and Vernon W. Johnson, III, Washington, DC, for appellant.

Barrie D. Berman and Karen C. Rindner, Washington, DC, for appellee.

Before FERREN and REID, Associate Judges, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

Ulysses G. Auger appeals the trial court's judgment in favor of appellee, Tasea Investment Company, for $69,243.38 in back rent under their lease agreement. Appellant claims that the trial court erred in concluding that appellee could unilaterally raise the rent without serving a valid notice to quit, and alternatively that the trial court abused its discretion in allowing appellee to recover more damages than it had reserved the right to seek in the Joint Pretrial Statement. We affirm.

## I.

The property at issue in the agreement consisted of a parking lot area located behind 1255 22nd Street, N.W., Washington, D.C. ("parking lots"). The parking lots were owned by 1255 22nd Street Limited Partnership. Originally, there were two general partners in the partnership. However, the partnership was restructured in the summer of 1991, and pursuant to the partnership agreement, there was a single general partner and appellant became a limited partner. A section of the agreement allowed appellant to lease the parking lots. Originally, the parties orally agreed to a rent of $500 per month. Appellant never paid any of the rent due under this agreement.

In June of 1993, appellee wrote a letter to appellant informing him that the partnership needed the premises and requested him to leave since no payments had been made. When appellant did not vacate the lots, appellee informed him in a letter dated October 8, 1993, that pursuant to the partnership agreement, there would be an increase in the rent to $168.94 per day. This amount was based on the income appellee anticipated from utilizing the parking lots as a commercial property.

Appellant filed this lawsuit in the Superior Court on November 5, 1993. He sought a declaratory judgment, as well as a temporary restraining order, preliminary injunction, and permanent injunction against any interference by appellee with appellant's rights under the agreement. Appellee filed a counterclaim in which it requested that appellant be required to vacate the property and pay back rent in the amount of $1,500 per month from August 1, 1991 until October 8, 1993, when the rent increased to $168.94 per day.

Appellee's motion for summary judgment was denied, and the parties submitted their Joint Pretrial Statement. Appellee reserved the right to claim $1,500 in monthly rent in the "Relief Sought" section.[1] The case was heard in a one-day bench trial on October 24, 1995. On October 25, 1995, the trial judge held that appellee had the right to terminate the lease, but that it had not served a valid notice to quit, and therefore its request for ejectment was denied. The court also held that appellee was entitled to back rent in the amount of $69,243.38, based on the monthly rent of $500 from August 1, 1991 through December 1, 1993, and the higher rate of $168.94 per day for the period December 1,

---

1. At the beginning of the trial appellee admitted that the original monthly rent was $500 as op- posed to $1,500.

**20**

1993, through the effective date of judgment.[2] Appellant filed a motion for reconsideration, or to alter or amend judgment, which was denied. Timely notice of appeal was filed.

## II.

Appellant asserts that the trial court committed reversible error in concluding that appellee could properly raise the rent without serving appellant a valid notice to quit. In ruling on this issue, the trial court focused specifically on the pertinent section of the agreement:

> Auger or his designee shall have the right to lease from the Partnership at a reasonable monthly rate ... (ii) the Woodson/Callow lots for parking of vehicles until such time as the Partnership shall need the use of same. Auger shall provide to the Partnership evidence of appropriate insurance liability coverage.

The court found that appellant had used the property extensively without paying any compensation. The court concluded:

> there is no limitation in the partnership agreement about the partners not being able to raise the rent, and after a reasonable period of time, and having in the partner's judgment having found a valid commercial purpose for this lot, I see no reason why any agreement should stand between the partnership's right to raise the rent to $168.94 a day, which is what they said they were going to do if Mr. Auger remained. I find that this is within the rights of the partnership to do it. This is a commercial lease between sophisticated businessmen.

Therefore, after allowing for reasonable notice, the court calculated that appellant's rent increased to $168.94 per day as of December 1, 1993.

We agree with the trial court that there was no limitation in the partnership agreement regarding an increase in rent. The partnership provision does not provide for a specific rent or even the requirement of consent to an increase, rather the pertinent provision requires that the rent be "reasonable." The parties to the agreement were sophisticated businessmen on relatively equal footing. Thus, we are constrained to avoid rewriting contracts entered into by parties with relatively equal bargaining power. We dealt with a similar issue when deciding how to apportion liability when two insurance policies containing "other insurance" clauses insured the same risk. *See Jones v. Medox, Inc.,* 430 A.2d 488 (D.C.1981), *reprinted in* David P. Van Knapp, J.D., Annotation, *Resolution of Conflicts, in Non–Automobile Liability Insurance Policies, Between Excess or Pro–Rata "Other Insurance" Clauses,* 12 A.L.R.4th 981 (1982). It was noted:

> It has been observed that "(q)uestions of contribution between coinsurers have caused much trouble to the courts, a large part of which has arisen through efforts to equalize equities outside the contract," and that "(t)his trouble is lessened if the parties are left with their contracts as they themselves have made them."

*Id.* at 494 (quoting *Grollimund v. Germania Fire Ins. Co.,* 82 N.J.L. 618, 621, 83 A. 1108, 1109 (1912) (other citations omitted)). This court chose to "focus[ ] on the contractual provisions and the intent of the parties" as opposed to attempting to rewrite a more equitable agreement. *Id.* In the situation presented here there is an even greater reason to focus on the contractual provisions because there does not appear to be a need to "equalize equities." Therefore we decline to rewrite the contract and inject other provisions into a broad but unambiguous agreement.[3]

Appellant argues that appellee was obliged to serve a notice to quit on appellant prior to raising the rent. While this case involves a variation of the leasing of space, it is clear that the thrust of this dispute is the rental of parking space under the terms of a partnership agreement. Given that the primary purpose of a notice to quit is to terminate a

---

**2.** The trial judge concluded that appellant was entitled to pay the original rent until December 1, 1993, since he was a month-to-month tenant entitled to notice of the rent increase.

**3.** The record reveals an exhibit offered by appellee asserting the increased rent as reasonable; appellant presented no contrary evidence.

tenancy, *see* D.C.Code § 45–1402 (1990 Repl.), we find no authority which requires a notice to quit to precede a rent increase as long as the increase is consistent with the "reasonable monthly rate" of the agreement. Stated another way, appellant could either contest whether the rate was reasonable or simply decline to rent the space at the increased rate. At bottom, that was the agreement reached by the parties. Accordingly, no notice to quit was required.

### III.

Appellant also contends that the trial court abused its discretion by granting appellee back rent in an amount more than appellee requested in the Joint Pretrial Statement. In construing Super. Ct. Civ. R. 16, which governs pretrial orders, we have said:

> While this rule is intended to remove cases from the "realm of surprise," it does not contemplate or require that rigid adherence to the pretrial order must always be exacted.

*Clarke v. District of Columbia,* 311 A.2d 508, 511 (D.C.1973) (citation omitted). The trial court has discretion whether to require a strict adherence to a pretrial order, and at times, we have upheld the trial court's refusal to allow such changes when there would have been unfair prejudice and surprise to the opposing party. *Taylor v. Washington Hosp. Ctr.,* 407 A.2d 585 (D.C.1979), *cert. denied,* 446 U.S. 921, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980).

In this case, the trial court exercised its discretion by awarding damages in an amount more than appellee requested in the pretrial statement. Appellant cannot argue that he was surprised or unfairly prejudiced by this award because appellee specified the proper amount of back rent in its counterclaim. On balance, we find that the trial court did not abuse its discretion in granting $69,243.38 in back rent.

*Affirmed.*

---

1. Although acknowledging that this case concerns "the leasing of space," *i.e.,* a lease agreement, the majority concludes that "the thrust of this dispute is the rental of parking space under the terms of a partnership agreement." *Ante* at 21.

FERREN, Associate Judge, dissenting:

Contrary to the majority's focus on the parties' relationship as business partners,[1] resolution of this case depends solely on the proper interpretation of a month-to-month lease agreement for real property, unaffected by other aspects of the parties' business relationship.

### I.

During the one-day bench trial on October 24, 1995, the parties presented evidence of their written agreement, which provided:

> AUGER or his designee shall have the right to lease from the Partnership at a reasonable rate ... (ii) the Woodson/Callow lots for parking of vehicles until such time as the Partnership shall need the use of same.

No other provision of the partnership agreement is at issue here. The trial court, not surprisingly, found this agreement "sufficiently ambiguous to require the use of parol evidence ... to flesh out what precisely was meant."[2] The court then found, by considering both the written agreement and testimony about the oral negotiations between the parties, that Auger and Tasea had agreed to a month-to-month lease of commercial property for $500 a month. That is what the court found "reasonable rate" under the agreement meant. There was no finding that the parties had agreed it could mean anything else. In short, the trial court concluded that the lease provision of the partnership agreement had created a month-to-month tenancy for $500 per month—period.

The question, then, is how Tasea could lawfully get out of the arrangement either by evicting Auger or by charging him more. Under District of Columbia law, a landlord can hold a tenant liable for an amount greater than the agreed rental for property leased month-to-month only in two ways: (1) the

---

2. It is unclear how or why the majority is able to conclude that the contract is "a broad but unambiguous agreement." *Ante* at 21.

landlord may unilaterally terminate the lease by giving a valid thirty-day notice to quit,[3] followed by the tenant's remaining on the property as a hold-over tenant liable for any increased value;[4] or (2) the parties can mutually agree to a new lease, accomplishing a novation of the old lease without need for a formal termination procedure. In the first situation, any increase upon expiration of the tenancy must be attributable to a demonstrably greater value of the premises than the previously bargained rent level reflected. See *supra* note 4. In the second situation, the parties will have bargained for a new tenancy at a higher rent level.[5]

In deciding whether Tasea should be awarded possession of the property, the trial court expressly found that Tasea's representatives "have not served the notice to quit, and therefore they have no right to evict Mr. Auger until they do so." Thus, the question became: could Tasea—faced with Auger still lawfully on the premises—begin to charge a higher rent?

The trial court considered how much money Auger owed under the lease. The court began by ruling that, although Auger had not received a valid notice to quit, Tasea could not increase the rent for the thirty-day period that a valid notice to quit would allow a tenant to remain at the contracted rent.

> Mr. Auger has not paid the partnership the $500 a month he agreed to pay in this which I find was a part of the agreement.
>
> And, the $500 a month which runs from August 1st, 1991, I find until December 1, 1993, 28 months for $14,000. I calculated that by the fact that that rental until that date is that Mr. Auger is a month-to-month tenant, and a month-to-month ten-

ant under the law of the District of Columbia is entitled to 30 days notice to leave, and the 30 days has to be at the anniversary of the 30th day of the agreement, and I find that the 30th day would be December 1, 1993 because the notice of the increased rent was sent to him on October 8th. So he had through in my judgment, he is entitled to remain at the old rent for a full 30 days more. And, that would expire December 1st.

The court then made a mistake. It ignored the novation/renegotiation requirement for increasing the rent absent a valid notice to quit; the court simply allowed Tasea to increase the rent unilaterally.

> At [December 1st], there is no limitation in the partnership agreement about the partners not being able to raise the rent.... I see no reason why any agreement should stand between the partnership's right to raise the rent to $168.94 a day, which is what they said they were going to do if Mr. Auger remained. I find that this is within the rights of the partnership to do it. This is a commercial lease between sophisticated businessmen.... Mr. Auger could easily have avoided paying this rent by moving out. He chose not to, and therefore I find that he is voluntarily remaining on the property in the face of the notice, and is therefore responsible for the rent at $168.94 a day from December 1, 1993 to today, which adds up to a total of $55,243.13, which plus the $14,000 is a grand total of $69,243.38 rent due and owing from Mr. Auger.

There was no finding that the parties mutually had agreed to a particular higher rent, or that Auger had agreed in advance to a partic-

---

3. *See* D.C.Code § 45–1402 (1990 Repl.).

4. *See Novak v. Cox*, 538 A.2d 747, 751 (D.C.1988) (hold-over "tenant could not remain on premises without paying its 'fair use and occupancy value'"); *Habib v. Thurston*, 517 A.2d 1, 18 (D.C. 1985) (hold-over tenant liable for damages for continued use and occupancy of premises); *Fisher v. Parkwood, Inc.*, 213 A.2d 757, 759 (D.C. 1965) ("receipt of rent after the lease was cancelled was merely for use and occupancy during the hold-over period"); *see also Sanchez v. Eleven Fourteen Inc.*, 623 A.2d 1179, 1181 (D.C.1993)

("A holdover tenant is bound by the terms and conditions of the original lease and is liable to the landlord at least for rent or its equivalent.").

5. If a landlord serves on the tenant a valid notice to quit and says, at the same time, that as of the termination date the rent will increase 100–fold if the tenant holds over, the trier of fact will confront the question whether, under all the circumstances, the tenant can be held to have agreed to a new, higher-rent tenancy if the tenant stays on the property or will be held responsible, instead, for damages based on fair use and occupancy value.

ular rent increase if certain events occurred, such as a valuable zoning change or more lucrative plans for the property. The court nonetheless ruled, as a matter of law, that since the partnership (Tasea) had "said [in an October 8, 1993 letter to Auger] they were going to" raise the rent to $168.94 per day, they had a right to do so simply because "there is no limitation in the partnership agreement about the partners not being able to raise the rent." The court magically transformed the parties' relationship as to the parking lot from landlord and tenant to general partner and limited partner, and ruled that Tasea could dictate, unilaterally, what Auger should pay.

## II.

We should analyze this trial court ruling in depth, beginning with our standard of review. This court accepts the trial court's findings of fact unless clearly erroneous or without evidentiary support, but we review the trial court's legal conclusions *de novo*. *See Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 89 (D.C.1994). We therefore must accept the trial court's finding that the parties' oral negotiations created a month-to-month tenancy at the "reasonable rate" of $500 per month unless it is clearly erroneous or without evidentiary support. On the other hand, the question whether a landlord unilaterally may raise the rent under a month-to-month tenancy without terminating the tenancy either through a legally valid, properly served notice to quit, or through a novation as part of a newly negotiated lease, is a question of law subject

to review without deference to the trial court's analysis.

If we proceed from the trial court's finding that the parties had negotiated a month-to-month lease at $500 per month—a finding that the majority does not challenge and is not clearly erroneous on this record—then there is no basis in the agreement or at law for the court to permit a unilateral rent increase simply because the partnership agreement has "no limitation" against it. There is not a particle of evidence, let alone a trial court finding, that Auger agreed to such a thing. The agreement was for rent at a "reasonable rate." The court found the parties had agreed that $500 per month was reasonable. Even if Tasea and Auger both had anticipated that the "reasonable rate" for the premises would increase over time, there is no basis of record for inferring, let alone a trial court finding, that the parties had agreed that the time for an increase had come, or that they had put in place some mechanism for determining an increase in the established "reasonable rate" without further negotiations.[6]

True: Auger owed back rent from the beginning, at $500 per month; he was not a model, not even an honorable, tenant. But, as spelled out earlier, there are two—and only two—lawful ways to impose a rent increase in such a situation, and Tasea did neither. Tasea did not properly terminate Auger's tenancy, taking steps to evict him and hold him liable, as long as he stayed, for the reasonable (increased) value of the premises as a hold-over tenant. See *supra* notes 3 & 4. Nor did Tasea negotiate a new rental

---

6. Tasea argues that the lease agreement was for a "reasonable rate" and that the reasonable rate increased dramatically when Tasea obtained a license to use the lots commercially. Tasea's argument, however, directly contradicts the trial court's factual finding, supported by the evidence, that the parties had agreed the reasonable rate Auger would pay was $500 per month. No mechanism for changing that amount was in evidence.

A contract will be unenforceable if its terms are so uncertain that a court cannot accurately assess damages. RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. b (1981). In this case, it is doubtful, as a matter of law, that the court could have enforced a "contract" in Tasea's favor had

the parties merely agreed to a "reasonable rate" of rent without indicating what that meant or how it might be ascertained from time to time. Instead, the proper measure of damages would have been non-contractual: the reasonable value of Auger's use and enjoyment of the premises. *See William J. Davis, Inc. v. Slade*, 271 A.2d 412, 416 (D.C.1970) (landlord entitled to reasonable value of premises when court determines lease is void because of housing code violations). Here, the trial court made no finding that the $500 per month agreement had lawfully been terminated, let alone a finding that the reasonable value of the premises had increased in a particular amount.

agreement with Auger in lieu of invoking the judicial process.[7]

This case therefore turns on the proposition that, in the absence of an agreement to the contrary—and despite the majority view, there is no contrary agreement here—a landlord cannot alter the terms of a month-to-month tenancy without first terminating that tenancy by a valid notice to quit.

The statutory scheme makes this clear. D.C.Code § 45–1402 provides:

> A tenancy from month-to-month ... may be terminated by a 30 days notice in writing from the landlord to the tenant to quit, or by such notice from the tenant to the landlord of his [or her] intention to quit, said notice to expire, in either case, on the day of the month from which such tenancy commenced to run.[8]

This notice to quit requirement applies to commercial, as well as residential, tenancies. *See Ontell v. Capitol Hill E.W. Ltd.*, 527 A.2d 1292, 1294 (D.C.1987). As the trial court recognized, "service of a valid notice to quit is a condition precedent to the landlord's suit for possession." *Moody v. Winchester Management Corp.*, 321 A.2d 562, 563 (D.C.1974). Tasea, moreover, does not dispute the trial court's ruling that Auger had the legal right to retain possession of the property until Tasea satisfied the legal requirements for obtaining possession.[9]

Tasea nonetheless contends that "a landlord's right to raise the rent is not dependent on serving a notice to quit." Tasea, therefore, takes the paradoxical position that a notice to quit is required to terminate the tenant's right to possession of property but not required to terminate the other contractual provisions of the lease—including perhaps the most significant provision, the rent. Such a rule of law theoretically would allow a landlord unilaterally to terminate a month-to-month tenancy, without resort to judicial action for summary possession, by announcing a substantially higher rent on a moment's notice—without giving a valid notice to quit—and charging the tenant who chooses to leave under such circumstances a whopping premium for the period between the announced rent increase and the date the tenant finally manages to leave.

Recognizing this possibility, the trial court did not allow the rent increase to take effect until the period for a valid notice to quit had expired. But that proves the point: the court realized the law protects the tenant for a period of time before the landlord can force a change in the tenancy, and yet the court—acting inconsistently—allowed a lesser quality notice to justify a unilateral rent increase than the notice required to justify an eviction. The trial court thereby permitted the landlord to accomplish a rent increase—meaning a new lease—without the tenant's consent. If one tries to justify this ruling by saying that the tenant, in holding over, implicitly consented to the new rent, one necessarily would be saying that the landlord can force a month-to-month tenant to accept a new lease without giving the statutory notice required before making the tenant give up the old one. This is not a bargained novation/new lease; it is a unilateral pressure play not recognized at law.

The proper procedure for altering the terms of a tenancy is reflected in *Wilson v. John R. Pinkett Inc.*, 265 A.2d 778, 779 (D.C. 1970). In *Wilson*, the landlord asked the tenants at sufferance to agree to a written lease, including a provision expressly waiving their right to receive a notice to quit. When the tenants failed to agree, the landlord served them with a notice to quit. The ten-

---

7. Of course, Tasea, as landlord, could properly terminate the existing tenancy and use the expired notice to quit—with the accompanying threat of eviction—as leverage to negotiate a new lease with a higher rent. *See Wilson v. John R. Pinkett, Inc.*, 265 A.2d 778, 779 (D.C.1970).

8. A valid notice to quit must be (1) personally served on the tenant, or (2) personally served on a person over the age of sixteen upon the premises, or (3) posted in a conspicuous place on the premises and "mailed first class U.S. mail, post-age prepaid to the premises within 3 calendar days of the date of posting." D.C.Code § 45–1406; *see Jones v. Brawner Co.*, 435 A.2d 54, 56 (D.C.1981).

9. Auger could have brought a suit for wrongful eviction if Tasea had resorted to self-help to bar him from using the property. *See Mendes v. Johnson*, 389 A.2d 781, 787 (D.C.1978) (en banc) (establishing tort of wrongful eviction).

ants argued on appeal that the landlord unilaterally was attempting, unlawfully, to change the terms of the tenancy. We rejected this contention, concluding that the "landlord's request that the tenants agree to a written lease was an attempt not to change the terms of the tenancy but to terminate it and substitute a different one for it." *Id.* We therefore upheld the landlord's course of action, ruling that it was proper for the landlord, after serving a valid notice to quit, to evict tenants who refused to enter into a new lease agreement on the landlord's terms. Although we did not directly address whether service of a valid notice to quit was a prerequisite to forcing a change in the terms of the tenancy, including the rent level, it is clear from the context that we considered such statutory notice essential, absent a bargained amendment of the lease.

This same principle was recognized more recently in *Sklar v. Hightower*, 342 A.2d 57 (D.C.1975). In that case,

> [t]he landlords orally informed the tenant that she must vacate by September 1, a date less than 30 days in the future, unless she agreed to a rent increase. That in effect was an attempted notice to quit by the landlords (with the tenant being given the option of staying and paying a higher rent), which itself did not comply with § 45–902 because it was not written and it did not furnish the full 30 days' notice.

*Id.* at 59. The tenant left the premises, despite the inadequate notice to quit, and then the landlords sought an additional month's rent because the tenant herself had not given the statutory thirty days' notice. We affirmed the trial court's ruling that the tenant did not owe the extra rent. We concluded that the landlords' own conduct pressing for early vacation of the premises amounted to a "waiver of the thirty days' notice requirement" and thus estopped them from claiming additional rent. *Id.* It is clear, moreover, from our presentation of the issue in *Sklar* quoted above that the landlords' noncomplying notice to quit, if not honored by the tenant, would not have permitted the rent increase the landlords sought.

The trial court's ruling is fundamentally at odds with the general principles of contract law applicable to lease agreements. *See Bown v. Hamilton*, 601 A.2d 1074, 1078–79 (D.C.1992) (" 'leases of urban dwelling units should be interpreted and construed like any other contract' ") (quoting *Javins v. First Nat'l Realty Corp.*, 138 U.S.App. D.C. 369, 373, 428 F.2d 1071, 1075 (1970)). The trial court found that Auger and Tasea had entered into a month-to-month lease at $500 per month. "The parties to a contract are free to modify that contract by mutual consent." *Hershon v. Hellman Co.*, 565 A.2d 282, 283 (D.C.1989). No evidence was presented, however, that there was mutual consent to a higher rent rate here. To the contrary, Auger filed suit against Tasea approximately one month after receiving Tasea's rent demand.

Tasea's unilateral modification argument also fails because modification of a contract must be supported by consideration. *See Hershon*, 565 A.2d at 283 ("In order to be valid, however, the modification must possess the same elements of consideration as necessary for normal contract formation."). No consideration supported Tasea's demand to increase the rent from $500 per month to $168.94 per day.

### III.

Tasea wanted Auger either off the property or on the property at a rent higher than $500 a month. The law therefore obliged Tasea (1) to evict Auger by properly serving a valid notice to quit, or (2) to keep him there after terminating the existing tenancy with a valid notice to quit, exposing Auger to liability as a holdover tenant after the notice period expired, or (3) to keep him there at a mutually agreed higher rent. None of these three possibilities happened. Tasea's unilateral effort to impose new lease terms should fail. I would reverse and remand for entry of judgment for arrearages in the amount of $500 per month.

Respectfully, therefore, I dissent.