INDEPENDENCE MANAGEMENT
COMPANY, INC., Appellant,

v.

ANDERSON & SUMMERS,
LLC, Appellee.

No. 03–CV–1105.

District of Columbia Court of Appeals.

Argued March 17, 2005.

Decided May 12, 2005.

Marc S. Moskowitz, Washington, for appellant.

Paul W. Mengel III for appellee.

Before SCHWELB, RUIZ and REID, Associate Judges.

SCHWELB, Associate Judge.

Independence Management Company, Inc. ("IMC"), appeals from an order of the trial court, entered on September 5, 2003, granting Anderson & Summers, LLC ("A & S"), specific performance of a contract for the sale of real property. IMC argues on appeal that the trial judge erred in concluding that IMC, rather than A & S, was in breach of the agreement between the parties. IMC also contends that, contrary to the trial judge's finding, A & S was not "ready, willing and able" to perform its obligations under the contract at the time contemplated in the instrument. We affirm.

## I.

### FACTUAL BACKGROUND

On May 3, 2001, IMC and A & S entered into a contract for the sale of an apartment building located at 501 12th Street, N.E. (the "Property"). The parties agreed to a purchase price of $950,000. The written agreement entered into by the parties can fairly be described as a standard real estate contract. Three provisions of the contract are of particular importance to the resolution of the parties' dispute. Paragraph 8 provided that settlement was to occur

> ten days from expiration of the Financing Contingency period ... *or as soon thereafter as* (a) the report on the title can be secured if promptly ordered by the Purchaser, (b) an appointment for settlement can be arranged with the Title Company, (c) a survey is procured, if one is necessary, and (d) *any and all contingencies herein set forth are satisfied....*

(Emphasis added.) The "Financing Contingency" referred to in Paragraph 8 provided the purchaser with forty-five days to obtain financing, with an option for a fifteen-day extension. Therefore, if there were no delays (such as those contemplated in sublines (a)-(d)), Paragraph 8 provided for settlement either fifty-five or seven-

ty days from May 3, 2001. The agreement did not otherwise specify a closing date.

Paragraph 13 provided that the contract was subject to the tenants' statutory right to purchase the Property.[1] This provision was no doubt included in the agreement in recognition of the rights accorded to the tenants to purchase the Property under the District of Columbia Rental Housing Conversion and Sale Act (the "Act").[2] Paragraph 13 did not specify, however, how the tenants' exercise of their statutory rights would affect the other provisions of the contract. Under the terms of Paragraph 13, IMC was required to "keep [A & S] apprised of all negotiations, correspondence, contracts and other developments with respect to the negotiations with the Tenants ... under the applicable law." Finally, Paragraph 20 stated that

the parties "agree that *time is of the essence* [to] this agreement." (Emphasis added.)

Soon after IMC and A & S entered into the contract of sale for the Property, the tenants began a protracted effort to exercise their statutory rights by forming a Tenants Association.[3] A representative of A & S learned of this development on May 14, 2001, while inspecting the Property on behalf of A & S.[4] Upon discovering that the Tenants Association had been formed, A & S contacted IMC and learned that, through the Association, the tenants were negotiating to purchase the Property. Because the tenants' intervention obviously placed A & S' own contract to purchase in doubt, A & S suspended its due diligence activities and, in particular, discontinued its efforts to obtain financing.[5] On May

1. Paragraph 13 reads, in pertinent part, as follows:

 It is expressly agreed that the obligations of Seller and Purchaser to make settlement hereunder are conditioned upon the right of the Tenants and/or such governmental entity to an opportunity to purchase the Property, as and if provided by the applicable law. The Seller hereby expressly reserves the right to sell the Property to the Tenants and/or such governmental entity on terms which comply with the applicable law. Upon settlement of the sale of the Property to the Tenants, and/or such governmental entity, this Agreement shall be void and the Deposit shall be returned to the Purchaser within 15 days of the settlement thereunder provided, however, that in the event of any such settlement, Seller shall pay to Agent the commission provided for herein. The Seller shall keep Purchaser and Agent apprised of all negotiations, correspondence, contracts and other developments with respect to the negotiations with the Tenants and/or such governmental entity under the applicable law.

2. D.C.Code § 42–3404.02(a) (2001) provides that:

 Before an owner of a housing accommodation may sell the accommodation, or issue a notice of intent to recover possession, or

 notice to vacate, for purposes of demolition or discontinuance of housing use, the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

 Section 42–3404.04 places the tenants' right to purchase above other purchasers:

 The right of a third party to purchase an accommodation is conditional upon exercise of tenant rights under this subchapter. The time periods for negotiation of a contract of sale and for settlement under this subchapter are minimum periods, and the owner may afford the tenants a reasonable extension of such period, without liability under a third party contract. Third party purchasers are presumed to act with full knowledge of tenant rights and public policy under this subchapter.

3. There was evidence that the Tenants Association had already been formed at the time the parties entered into the contract.

4. The representative noticed a flyer advertising a "Tenants Association meeting."

5. Prior to learning of the formation of the Tenants Association, A & S had made preparations for a survey, obtained loan commitment letters, ordered an appraisal of the

21, 2001, A & S sent a letter to IMC communicating its intention to "keep th[e] agreement in place until the tenants' right to purchase issue is resolved." A & S further requested that it be given "60 days after the tenants' right to purchase issue has been resolved to settle on the property." A & S did not receive a response to this request.

On June 20, 2001 (forty-eight days after IMC and A & S entered into their contract), IMC entered into a separate contract with the Tenants Association for the sale of the Property. In a letter dated February 8, 2002, A & S reiterated to IMC that A & S intended to honor its own contract in the event that the proposed sale to the tenants did not come to fruition. A & S again requested that settlement between A & S and IMC occur within sixty days of the expiration of the tenants' contract.[6] Once again A & S received no response from IMC. On March 1, 2002, eight months after the tenants signed their agreement with IMC, the proposed sale to the tenants broke down, and the tenants terminated their contract with IMC.[7] IMC did not immediately notify A & S that the contract with the Tenants Association had fallen through. Rather, A & S learned of the termination of that contract from one of the tenants on March 20, 2002, some three weeks after the fact.[8]

Upon learning that the tenants were out of the picture, A & S notified IMC that A & S had renewed its efforts to obtain financing and proposed to proceed towards settlement. In addition, A & S suggested settlement within seventy days "in accordance with the time frames contemplated in the Purchase Agreement." On March 26, 2002, IMC officially notified A & S that the tenants were no longer pursuing their statutory right to purchase the Property, but rejected A & S' proposed closing schedule. Instead, IMC demanded that settlement occur on April 5, 2002, ten days after A & S received official notification. A & S responded by rejecting IMC's proposed closing date, and offered May 10, 2002 as an alternative. IMC held firm to its demand for closing on April 5.

In the meantime, A & S proceeded to make preparations for settlement on May 10. A & S obtained loan commitment letters, and it made arrangements for surveys and for an inspection. On April 5, A & S failed to appear at IMC's closing, and IMC declared A & S to be in default. Although IMC maintained that it suffered substantial damages as a result of A & S' refusal to settle on April 5, IMC proposed merely to terminate the agreement "in the spirit of compromise." On May 10, A & S

---

Property, received a zoning compliance letter, and arranged for an environmental study and for an inspection of the Property.

**6.** In accordance with the Act, the contract between IMC and the Tenants Association afforded the tenants a time period of 240 days to achieve readiness for settlement. D.C.Code § 42–3404.11(3)(A) (2001).

**7.** Several of the tenants maintain that they were "misled" into signing letters of intent to purchase the Property. IMC accuses A & S of unscrupulously interfering with the contractual relationship between IMC and the Tenants Association, and claims that representatives

of A & S trespassed on the property in order to speak with tenants. This dispute no doubt added to the hostility between the parties and may have further fueled the engine of litigation.

**8.** IMC asserts that A & S learned of the termination of the contract on February 19, 2002, and, presumably, that A & S should have therefore resumed its due diligence efforts at that point. The contract, however, squarely places an obligation on IMC to keep A & S "apprised of all negotiations, correspondence, contracts and other developments" regarding the tenants' exercise of their statutory rights. *See* Paragraph 13, *supra* note 1.

held its own closing, at which, unsurprisingly, IMC did not appear.

A & S filed suit against IMC for breach of the contract of sale. A & S asked the court to order specific performance. Following a non-jury trial, the trial judge ruled in favor of A & S. The judge found that A & S had performed all of its obligations under the parties' agreement, and that the contract, fairly construed, did not require the purchaser to "stand ready perpetually without any ... end date in mind, to settle within ten days." In the judge's view, "when no time is specified, a reasonable time is implied...." The judge further found, with respect to the dispute regarding an appropriate closing date, that under the circumstances "[s]ixty to seventy days ... is a reasonable period of time...." In support of this finding, the judge cited the original contract, which provided for fifty-five to seventy days for closing in the event that no contingencies arose. The judge granted A & S' request for specific performance, noting that specific performance is "almost a presumed remedy in a real estate setting," and that the equities of the case also supported the granting of this remedy. Finally, the judge found that A & S was "ready, willing and able to perform the contract within a reasonable time...." The judge ordered that closing occur within seventy days of the date of the Order of Judgment. IMC filed a timely Notice of Appeal.

## II.

## LEGAL ANALYSIS

A. *Standard of review.*

██ "When the trial court sits as factfinder, its factual findings are accorded considerable deference and are reviewed under a 'clearly erroneous' standard. Where the matter under review is a question of law, however, this court exercises

de novo review." *Technical Land, Inc. v. Firemen's Ins. Co. of Washington, D.C.*, 756 A.2d 439, 443 (D.C.2000) (citations omitted). Resolution of the issues in this case turns on general principles of contract interpretation. *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981). In construing a contract, the court must "determin[e] what a reasonable person in the position of the parties would have thought the disputed language meant." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C.1984). "The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *Id.* Where the language in question is unambiguous, its interpretation is a question of law for the court. *Id.* "A court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract ... and will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Bragdon v. Twenty–Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1170 (D.C.2004) (citations omitted); *accord, Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1206 (D.C.1999). Where a contract may reasonably be viewed as having more than one possible meaning, "[i]t is a fundamental rule that in the construction of contracts the court may look not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made." *Merriam v. United States*, 107 U.S. 437, 441, 2 S.Ct. 536, 27 L.Ed. 531 (1883).

██ Specific performance is an extraordinary equitable remedy, and the determination whether or not to order specific performance is confided to the "sound and informed discretion" of the trial court. *Drazin v. Am. Oil Co.*, 395 A.2d 32, 34

(D.C.1978). We must accept the trial judge's finding that A & S was "ready, willing and able to perform the contract," and therefore entitled to specific performance, so long as that finding is not clearly erroneous. *See Flack v. Laster,* 417 A.2d 393, 400 (D.C.1980).

### B. *Interpretation of the contract.*

■ IMC contends that the issues in this case can be resolved by looking solely to the "four corners of the document." Because the contract made no specific provision for suspension or postponement of A & S' obligations under the sales agreement, IMC argues that all of the provisions of the contract remained in effect, notwithstanding the tenants' exercise of their statutory right to purchase the Property and the negotiation of a separate agreement between the Tenants Association and IMC. Under the express terms of the contract between A & S and IMC, settlement was to occur ten days after the expiration of the forty-five-day financing contingency (with the possibility of a fifteen-day extension), or "as soon thereafter as" certain contingencies were resolved. Under any reasonable view of A & S' agreement with IMC, this time period could not and did not continue to run during the eight months when IMC was under contract to sell the property to the Tenants Association.

In *Pagan v. Murray,* 628 A.2d 110 (D.C. 1993), we held under similar circumstances that the "settlement provision must be read in conjunction with and modified by the provision on tenants' rights so as to allow the requisite time for the resolution of those rights." *Id.* at 112. When the seller in *Pagan* purported to declare the contract void upon the expiration of the contractual settlement period, notwithstanding the interruption of that period by negotiations with the tenants, the court held that the purchaser was not in violation and that the seller, in refusing to perform, was liable for breach of contract. *Id.* Our decision in *Pagan* therefore stands for the proposition that certain of the parties' obligations under a contract of sale of this kind are suspended (but not voided) while the tenants are exercising their rights under the Act. *Pagan* did not, however, resolve what the rights and obligations of the purchaser and seller would be upon expiration of the tenants' rights. Therefore, in this case, we are obliged to pick up where *Pagan* left off.

In this case, Paragraph 13 of the contract expressly provides that the parties' obligation to make settlement was subject to the exercise by the tenants of their rights under the Act. The contract is silent, however, as to what was to occur in the event that the tenants' efforts to purchase the Property should be discontinued. Contrary to IMC's position, one searches the contract in vain to find a resolution of this question within its "four corners." Therefore, in accordance with general principles of contract interpretation, we must determine what a reasonable person in the position of the parties would have thought that the contract required. *See 1010 Potomac Assocs.,* 485 A.2d at 205.

■ According to IMC, the contract should be interpreted to require A & S to complete all of its obligations under the instrument (short of settlement), and to be able to effectuate settlement within ten days of the expiration of the tenants' rights in accordance with Paragraph 8.[9] A

---

**9.** We note that in light of the testimony presented at trial and credited by the trial judge, IMC was really demanding settlement ten days after A & S received official notification from IMC of the expiration of the tenants' rights, and not ten days from the actual date of expiration. Indeed, IMC's demand for settlement came some three weeks after the con-

& S contends that this interpretation is unreasonable, for it would require the purchaser to "stand perpetually ready" to settle without any specific end date in mind. A & S points out that if it were required to be ready to close over the course of the eight months that a contract existed between IMC and the Tenants Association, financing would have to be renegotiated, surveys would expire, and interest rates could fluctuate. A & S argues that a construction of the contract which would require the purchaser to incur these additional costs, when there was no assurance that the sale would ever come to fruition, would be patently unreasonable.

 We conclude that a reasonable and fair-minded person in the position of the parties would not have contemplated that the purchaser must stand perpetually ready to settle while the tenants were seeking to exercise their rights. Such an interpretation of the agreement would place a significant burden on the purchaser, and absent an express provision in the contract indicating that this was the parties' intent, it is simply untenable. As previously noted, the parties contemplated a delay in settlement in the event the tenants exercised their right to purchase the Property, but they failed to provide a time for settlement once that delay came to an end. Generally, "[w]here no time is specified for the performance of an act, the law implies that it must be done within a reasonable time." *Flack*, 417 A.2d 393, 400 (citing *Drazin*, 395 A.2d at 34); *cf.* RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is *reasonable* in the circumstances is supplied by the court.") (emphasis added). There-

fore, construing the contract "as a whole, giving a reasonable, lawful, and effective meaning to all its terms," *1010 Potomac Assocs.*, 485 A.2d at 205, we conclude, as did the trial judge, that settlement was to occur within a reasonable time after the tenants' statutory rights expired.

### C. Determination of reasonableness.

 Having determined that the contract required settlement within a reasonable time after the Tenants Association ceased its efforts to purchase the Property, we now address the question whether, under the circumstances, the trial judge erred in finding that "60 to 70 days" was a reasonable time. Considering the trial judge's vantage point close to the action, while we are confined to a paper record, we owe a substantial measure of deference to the judge's determination of what was reasonable. "[I]n reviewing bench trials, this court will not reverse unless an appellant has established that the trial court's findings are plainly wrong" or without evidentiary support. *Vaas v. United States*, 852 A.2d 44, 47 (D.C.2004). We conclude that there was ample evidence supporting the trial judge's finding that sixty to seventy days was a reasonable time period for settlement. The original contract contemplated settlement within fifty-five to seventy days. Because, for the reasons we have stated, A & S was not required to "stand perpetually ready to close," the judge could reasonably find that after A & S was notified that the contract with the Tenants Association had been terminated, A & S would need a comparable period of time to become ready for settlement.

IMC points to the "time is of the essence" clause contained in Paragraph 20 of the contract. It argues that because "time was of the essence," sixty to seventy days

tract between IMC and the Tenants Association was terminated.

was too long, and therefore unreasonable. Even assuming, *arguendo,* that Paragraph 20 was an effective "time is of the essence" clause germane to the present dispute,[10] IMC is hard-pressed to invoke it under the circumstances. IMC did not demand performance from A & S until *three weeks after* its contract with the Tenants Association had been terminated. Moreover, this demand was made only after A & S had learned, from a source other than IMC, that IMC's contract with the Tenants Association had fallen through. Furthermore, when A & S repeatedly proposed a sixty-day closing schedule, IMC did not respond at all, and certainly never suggested that the contract provided for a far shorter period. IMC's conduct was not consistent with the approach that time was truly of the essence. Accordingly, Paragraph 20 does not at all undermine the trial judge's determination that sixty to seventy days constituted a reasonable time under the contract.

D. *Specific performance.*

 Specific performance is appropriate where "the legal remedy, usually money damages, is deemed to be either inadequate or impracticable." *Flack,* 417 A.2d at 400. "When land is the subject matter of the agreement, the legal remedy is assumed to be inadequate, since each parcel of land is unique." *Id.* Moreover, "[s]pecific performance is a purely equitable remedy that rests in the discretion of the court." *Id.* Nevertheless, in order to be awarded specific performance, the party seeking it "must show that he was ready, willing and able to perform" the contractual obligations. *Id.*

 The trial judge found that A & S was "ready, willing and able" to perform, crediting testimony that A & S could have closed on May 10. IMC contends that this finding was unsupported by the evidence and therefore clearly erroneous. Specifically, IMC emphasizes that A & S did not have any financing commitments in place on May 10, and therefore could not possibly have closed on that date.

 It is true that A & S presented evidence only that it had obtained *proposed* financing commitment letters. A & S does not assert that it actually obtained financing enabling it to settle on May 10. This is hardly astonishing. Under the circumstance, including the fact that IMC had held its own "closing" a month earlier, it would have been futile and wasteful for A & S to obtain financing for a closing in which the seller was not going to participate. IMC has cited no basis, in reason or authority, for the proposition that in order to be "ready, willing and able," a purchaser must go through useless motions and incur unnecessary expense in order to be entitled to specific performance. On the contrary, "the law does not require the doing of a futile act." *Hercules & Co. v. Shama Rest. Corp.,* 613 A.2d 916, 921 (D.C.1992) (quoting *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). It is sufficient for A & S to show that if IMC had carried out its responsibilities under the contract, reasonably construed, by selecting a closing date within a reasonable period of time, A & S would have been "ready, willing and able" to perform. *See Flack,* 417 A.2d at 401. The trial judge's finding to this effect, based in part on credibility determinations to which

---

**10.** This assumption is questionable, for the clause did not relate to a specific date or time, which is normally the purpose of a provision that "time is of the essence." *See* 12 THOMPSON ON REAL PROPERTY § 99.15(d), at 292 (David A. Thomas ed., 1994).

we owe deference, was amply supported by the evidence.

We also note that specific performance is an *equitable* remedy, and in this case we believe that equity supports the judge's decision. At every turn, A & S sought to move toward settlement, but its efforts were met with resistance from IMC. It may be that, during the eight months that the settlement was delayed as a result of the tenants' exercise of their right to purchase, the Property appreciated in value and that this development made the deal less attractive to IMC.[11] There is no indication, however, that the original contract between IMC and A & S was anything but a bargained-for arms-length transaction between two sophisticated parties. The possibility that the value of real estate will change before settlement occurs is a consideration in every real estate contract in the District of Columbia, and especially in every deal which is subject to the rights of the tenants under the Rental Housing Conversion and Sale Act. Both parties were no doubt fully aware of this reality, and neither is entitled to avoid its responsibilities simply because the bargain looked better to it before the tenants' intervention than it did after that intervention was concluded. Accordingly, equity favors specific performance of the contract.

## III.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*So ordered.*

---

11. A condominium development project situated near the Property got under way during the winter of 2002. IMC's listing agent acknowledged that the Property was "worth a lot more money now than it was at the time the tenants entered into a contract."