*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-59

WILLIAM J. DAVIS, INC., APPELLANT,

v.

THE TUXEDO LLC,

and

TUXEDO TENANTS ASSOCIATION, INC., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-8525-12)

(Hon. Neal E. Kravitz, Trial Judge)

(Argued May 20, 2015                    Decided September 24, 2015)

*Robert C. Gill*, with whom *Carolyn Due* was on the brief, for appellant.

*Eric M. Rome*, with whom *June L. Marshall* was on the brief, for appellee Tuxedo Tenants Association, Inc.

*Richard W. Luchs* and *Joshua M. Greenberg* filed a statement in lieu of brief for appellee The Tuxedo LLC.

Before FISHER and THOMPSON, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: This appeal invites us to interpret and apply the Tenants' Opportunity to Purchase Act (TOPA),[1] which authorizes an organization of tenants, under prescribed conditions, to purchase their building even though another party, such as a land developer, had already contracted to do so. In this case, a developer, appellant William J. Davis, Inc. (Davis), seeks reversal of the trial court's order granting summary judgment in favor of the appellee, Tuxedo Tenants Association, Inc. (TA)—a judgment allowing TA, instead of Davis, to purchase the apartment building where TA's members live. Davis contends that the trial court erred in several respects when it concluded that the purchase agreement between TA and The Tuxedo LLC (Seller), hereafter the "tenant contract,"[2] satisfied TOPA, and thus enjoyed priority over an earlier "third-party contract" entered into between Davis and the Seller for purchase of the same building.[3] Contrary to the trial court, we agree with Davis that TA and the Seller

---

[1] D.C. Code §§ 42-3404.01 to -3404.13 (2012 Repl.).

[2] The parties generally refer to the agreement between TA and the Seller as the "January 8" agreement. The record establishes that while TA submitted the agreement on January 8, 2012, the Seller did not sign it until January 12, 2012. For purposes of clarity, we refer to the January agreement as the "tenant contract."

[3] *See* D.C. Code § 42-3404.04 (2012 Repl.) (establishing that "[t]he right of a third party to purchase an accommodation is conditional upon exercise of tenant

(continued . . .)

failed to settle—or extend negotiations, as required by TOPA—before expiration of the settlement date contained in the tenant contract. Accordingly, the tenant contract lapsed. The trial court therefore erred in granting summary judgment for TA and denying summary judgment for Davis. We must reverse.

## I. Facts and Proceedings

This dispute concerns the intended sale of a forty-two unit residential property on T Street, Northwest. On July 15, 2011, Davis entered into the third-party contract with the Seller to purchase the property for $7,650,000. On July 26, 2011, as required by TOPA,[4] the Seller mailed materials to all the tenants describing the third-party contract with Davis and explaining the tenants' opportunity under TOPA to nullify the Davis deal and purchase the apartment building themselves. Next, as a prerequisite to the exercise of tenant rights under

_____

(. . . continued)

rights," and that a third-party purchaser is "presumed to act with full knowledge of tenant rights and public policy under this [Act]").

[4] D.C. Code § 42-3404.03 (2012 Repl.) (requiring the owner to "provide each tenant a written copy of the offer of sale by certified mail and post a copy of the offer of sale in a conspicuous place in common areas of the housing accommodation if it consists of more than one unit").

TOPA, the tenants formed TA, a nonprofit corporation, to negotiate and accomplish their acquisition. The Seller learned of TA's interest in purchasing the property on August 30, 2011.

The record does not document the ensuing negotiations. However, on January 8, 2012, TA submitted a contract to the Seller that matched the material terms of the third-party contract,[5] including price, and established a settlement date "as provided in" TOPA.[6] The Seller signed the tenant contract on January 12, 2012. TA then proceeded to engage EagleBank in an effort to finance the purchase. On May 8, 2012, EagleBank informed TA that its mortgage application was under consideration, and that the bank would render a decision "no later than September 10, 2012." TA forwarded this letter to the Seller, which had the effect

---

[5] The tenant contract consisted of hand-drawn alterations to the third-party contract. TOPA requires the owner to "furnish the tenant with a written 'offer' that includes ('at a minimum') the 'asking price and material terms of the sale,' and thereby [gives] the tenant the 'opportunity to purchase at' that price and on those terms." *1836 S St. Tenants Ass'n v. Estate of Battle*, 965 A.2d 832, 838-39 (D.C. 2009) (quoting D.C. Code §§ 42-3404.03, -3404.02 (a)).

[6] D.C. Code § 42-3404.11 (a)(3)(A) (2012 Repl.) (requiring settlement within 120 days and establishing that "[i]f a lending institution or agency estimates in writing that a decision with respect to financing or financial assistance will be made within 240 days after the date of contracting, the owner shall afford an extension of time consistent with that written estimate").

of extending the time before settlement an additional 120 days,[7] and setting the settlement date for September 10, 2012, or 240 days after the tenant contract was executed. The record does not reflect any further activity between TA and the Seller between May 8 and September 6, 2012, four days before the scheduled settlement.

On September 6, Eric Rome, TA's counsel, emailed Richard Luchs, counsel for the Seller, to convey TA's refusal to close under the terms of the tenant contract. Specifically, Rome wrote "that the TA cannot and will not close under its contract." Rome alleged that the Seller had "violate[d] TOPA in at least (but not limited to)" four respects, including a purchase price that "far exceed[ed] the market value of the property"[8] and a seller-financing option with terms that were "not reasonably acceptable" to TA.[9] The email went on to state that TA was

---

[7] *See id.*

[8] *See* D.C. Code § 42-3404.02 (a)(1) (requiring that "[t]he tenant and owner . . . bargain in good faith" and providing that "[t]he failure of an owner to offer the tenant a price . . . at least as favorable as that offered to third party" is "prima facie evidence of bargaining without good faith").

[9] *See* D.C. Code § 42-3404.05 (a-2) (2012 Repl.) (establishing that "[t]he owner may not require the tenant to pay the purchase price in installments unless
(continued . . .)

willing to "discuss the Seller's needs in good faith and to attempt to arrive at an accommodation" but reiterated that TA would not close under the contract. Rome ended by stating that TA remained hopeful that it would hear from the Seller "on a more productive note."

The following day, September 7, Luchs responded by email and denied Rome's allegations, asserting that "the seller has operated in good faith throughout this transaction." Luchs informed Rome that the contents of Rome's message would be passed along to the Seller and would be discussed.[10] Luchs closed by stating that, as Rome was aware, Luchs would be away for the next week, and that he would "get back to [Rome] promptly following [his] return with a more formal

_____

(. . . continued)
the owner provides deferred purchase money financing on terms reasonably acceptable to the tenant").

The two other alleged TOPA violations are not relevant to this appeal. One questions the ability of the third-party purchaser to demonstrate sufficient "financial ability" to meet its contract requirements. The other vaguely alleges the intent of the Seller to "circumvent the rights of the TA under TOPA" based on the "totality of the contract."

[10] Specifically, Luchs wrote that "Jerry . . . will be discussing your email with his partners and get back to me." The record does not identify Jerry, or disclose the identities of "his partners." Presumably Rome knew whom Luchs was talking about, but their identities have no relevance here.

response." If Rome "fel[t] compelled to file suit before [he] return[ed]," added Luchs, "so be it." Rome replied the same day that "[o]f course" TA would wait for the seller's counsel to return, because "dialogue" is preferable to litigation. The September 10 settlement date came and passed without any further communication between the parties.

On October 1, 2012, Davis informed the Seller of its intent to exercise its rights as the third-party purchaser under the July 15, 2011, contract. Davis asserted that TA had failed to close on the property within the 240 days authorized by TOPA, and insisted that Davis's contract had therefore been restored to its priority position. No further communication between Davis and the Seller can be found in the record, but the record contains additional correspondence between TA and the Seller evidencing continued negotiation over the property.

The first communication after the missed settlement date was an email from the Seller on September 21, 2012, asking TA to "put everything on hold" because the Seller "need[ed] to further consult with others before going forward." Almost a month later, on October 17, 2012, Luchs emailed Rome with a proposal by the Seller "to move forward on this transaction." The revised proposal included a new

price of $4,350,000, reflecting a reduction of $3,300,000 from the price agreed to in the January tenant contract. TA accepted the Seller's proposal with minor revisions on November 2, 2012. The revised agreement was characterized as a "contract amendment" that would "be made effective nunc pro tunc to the date before the TOPA period expired." Settlement was to be deferred, however, until the trial court resolved a declaratory judgment action, to be filed promptly by the Seller, to determine whether TA or Davis had the right to purchase the T Street property.

After the Seller filed suit, TA counterclaimed against the Seller and cross-claimed against Davis. Davis responded in kind, counterclaiming against the Seller and cross-claiming against TA. In dueling motions for summary judgment, both Davis and TA sought declarations of their contractual priority and specific performance on their respective contracts.

The trial court granted TA's motion for summary judgment based on the following findings and conclusions: (1) TA had standing to sue and be sued even though its corporate registration had been administratively revoked on September 4, 2012, six days before the scheduled closing, and was not reinstated until June

2013.[11] (2) The Seller and TA had waived the "time is of the essence clause" contained in the January tenant contract. (3) The November 2, 2012, agreement between TA and the Seller was an amendment to the January tenant contract; it was not a new, junior contract. (4) As a matter of law, the extension that the Seller granted TA from September 10, 2012, to November 2, 2012, for settlement was "reasonable" under TOPA.[12] Pursuant to these findings, concluded the court, the tenant contract had priority over the third-party contract, and thus Davis's conditional right to purchase would terminate when TA closed on the property.[13]

---

[11] Although the corporate registration was reinstated in June 2013, the trial court concluded that TA had standing to sue and be sued because its reinstatement related back to September 4, 2012, the date of revocation, pursuant to D.C. Code § 29-106.03 (d) (2012 Repl.) ("When [corporate] reinstatement under this section is effective, it shall relate back to and be effective as of the effective date of the administrative dissolution."). As we resolve the appeal on other grounds, we need not address the trial court's statutory interpretation.

[12] D.C. Code § 42-3404.04 (establishing that the owner of a property "may afford the tenants a reasonable extension of such [negotiation] period, without liability under a third party contract").

[13] The trial court and the parties spent considerable time at the hearing to ensure that the order adjudicated all claims and thus was final and appealable. Specifically, the court's Declaratory Judgment Order filed on December 16, 2013, provides that: (1) the Seller is entitled to a declaratory judgment; (2) judgment is entered in favor of TA and against the Seller on TA's counterclaim; (3) judgment is entered in favor of TA and against Davis on TA's cross-claim against Davis; (4) Davis's counterclaim and cross-claims (seeking declaratory relief and specific performance) are "dismissed with prejudice"; (5) TA's contract with the Seller, as

(continued . . .)

Davis filed a timely appeal (in which the Seller has taken "no position") and contends that the trial court erred with respect to each of its four rulings.

## II.  Standard of Review

The standard of review for summary judgment is well-established.  The question "whether summary judgment was properly granted is one of law," and we review *de novo*.[14]  For a party to be entitled to summary judgment, that party "must demonstrate that there is no genuine issue of material fact" and that it is entitled to judgment as a matter of law."[15]  Independently assessing the record, we view it in

_____

(. . . continued)
amended on or about November 2, 2012, is "valid and binding" and "has priority" over Davis's third-party contract.  The seller is ordered "to specifically perform its contract" with TA and Davis's right to purchase will terminate when TA closes on the property; (6) TA may present a claim for attorney's fees against Davis, which the court will consider "separately on its merits."

[14]  *Allman v. Snyder*, 888 A.2d 1161, 1165 (D.C. 2005) (citing *Abdullah v. Roach*, 668 A.2d 801, 804 (D.C. 1995)).

[15]  *Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs.*, 878 A.2d 1226, 1232 (D.C. 2005) (citation omitted).

the light most favorable to the party opposing the motion.[16]

## III. The Tenants' Opportunity to Purchase Act (TOPA)

Before turning to the merits, we believe that a brief overview of TOPA will be helpful. "The District of Columbia Council passed TOPA with the aim of 'discouraging the displacement of tenants through conversion or sale of rental property' and 'strengthening the bargaining position of tenants toward that end without unduly interfering with the rights of property owners to the due process of law.'"[17] "TOPA is a remedial statute, and it is to be generously construed 'toward the end of strengthening the legal rights of tenants or tenant organization[s] to the maximum extent permitted under law.'"[18] Both the "plain language" and "legislative history" of TOPA "leave no doubt that the rights of the tenants are

---

[16] *Id.* at 1232-33.

[17] *Linen v. Lanford*, 945 A.2d 1173, 1177-78 (D.C. 2008) (quoting D.C. Code § 42-3401.02 (1) (2001)).

[18] *Richman Towers Tenants' Ass'n v. Richman Towers LLC*, 17 A.3d 590, 601 (D.C. 2011) (quoting D.C. Code § 42-3405.11 (2001)).

paramount in relation to those of others, including subsequent owners."[19]  Thus, as noted earlier, a third-party purchaser "only has a conditional right" to the property, subject to "the exercise of tenant rights under the Act,"[20] and all third-party purchasers are presumed to "act with full knowledge of tenant rights and public policy" under the Act.[21]

Central to this appeal, "TOPA provides . . . that before the owner of a housing accommodation may sell the accommodation, he or she is required to 'give the tenant an opportunity to purchase the accommodation at a price and on terms which represent a bona fide offer of sale.'"[22]  The tenants association must accept "all of the material terms of the bargain,"[23] but the agreement may deviate

---

[19]  *Wilson Courts Tenants' Ass'n v. 523-525 Mellon St., LLC.*, 924 A.2d 289, 294 (D.C. 2007).

[20]  *Id.* (internal quotation marks omitted).

[21]  *Id.* at 292 (quoting D.C. Code § 42-3404.04).

[22]  *Richman Towers Tenants' Ass'n*, 17 A.3d at 601 (quoting D.C. Code § 42-3404.02 (a)).

[23]  *1836 S St. Tenants Ass'n*, 965 A.2d at 839 n.30 (other citation omitted) (citing *Hackney v. Morelite Constr.*, 418 A.2d 1062, 1068-69 (D.C. 1980)) (noting that "[t]he mere fact that a contract, definite in material respects, contains some

(continued . . .)

in non-material aspects.[24] Finally, as we have noted, TOPA provides for a period of 120 days between execution of the contract and settlement, which may be extended for an additional 120 days to "afford the tenant organization a reasonable period prior to settlement in order to secure financing and financial assistance."[25] These are "minimum periods," however, "and the owner [of the property] may afford the tenants a reasonable extension of such period, without liability under a third party contract."[26]

With this statutory framework in mind, we review the trial court's grant of summary judgment in favor of TA.

_____

(. . . continued)
terms which are subject to further negotiation . . . will not bar a decree for specific performance").

[24] *Id.* at 843-44 (recognizing the "basic contractual rule that an offeree's timely, unqualified acceptance of a valid offer results in a binding contract even if non-material terms remain for the parties to address" and concluding that this court has not interpreted TOPA to reject the rule).

[25] D.C. Code § 42-3404.11 (2), (3)(a) (2012 Repl.).

[26] D.C. Code § 42-3404.04.

## IV. Which Contract Has Priority?

As indicated earlier, in responding to the Seller's action for declaratory judgment and to TA's cross-claim, Davis contests all four trial court rulings. We conclude that the trial court erred when it found that the emails on September 6, and 7, 2012, between Luchs and Rome could be "reasonably interpreted to constitute an extension" of negotiations pursuant to D.C. Code § 42-3404.04 before the September 10, 2012, settlement date lapsed.[27] Because this error alone proves fatal to TA's contract with the Seller and its purported amendment, we need not discuss Davis's three other claims of error. We elaborate below.

We must determine *de novo*, based on counsels' email exchange, whether the parties agreed to extend negotiations and waive the initial settlement date.[28] The objective indicators establish that on September 7, 2012, TA agreed to wait for

---

[27] See *supra* note 12.

[28] *See 1836 S St. Tenants Ass'n, Inc.*, 965 A.2d at 839 (citations omitted) (interpreting TOPA to require that the parties agree to all material terms and "objectively manifest[] a mutual intent to be bound" to constitute an enforceable contract).

an answer from the Seller about TA's claimed TOPA violations, rather than file suit immediately, but there is no indication that the parties agreed to continue negotiating about revisions of the tenant contract before TA failed to honor the fleeting September 10 settlement date.

More specifically, for the eight months after execution of the tenant contract in January 2012, the record contains no evidence of any communication between TA and the Seller. Thereafter, the first contact is attorney Rome's September 6, 2012, email to attorney Luchs, four days before the parties were scheduled to settle. In that email, Rome, on behalf of TA, declared unequivocally that TA "cannot and will not close under its contract." That firm declaration, in Rome's first substantive paragraph of the email message, was not accompanied by any language to suggest that his position was contingent upon some other event, or that TA's refusal to close on the contract was merely a possibility, open to negotiation. Rome flatly announced TA's refusal to perform.

Having declared that TA would not close on the property under the original contract, Rome went on to allege that the Seller had violated TOPA "in at least (but not limited to)" four enumerated accusations. After commenting about TA's

attempts to "discuss the Seller's needs in good faith," Rome again stated that "it is no longer possible" to "close under the terms of the contract," at that point revealing—apparently for the first time—that TA had failed to locate a financing partner.[29]  In light of the alleged TOPA violations, Rome said, he "anticipate[d] filing suit on [the matter] next week, seeking Declaratory Relief, Specific Performance, and Damages" absent "any indication of a willingness to talk." Rome's email also briefly stated that the "offer remains open at any time" "to attempt to arrive at an accommodation," but this overture is subordinate to the two, unequivocal declarations that TA would not perform under the agreement, as well as to the direct threat to sue within a week, absent affirmative action by the Seller. The most reasonable reading of this September 6 email, therefore, establishes that TA signaled—quite clearly—that it had moved from a posture of negotiation to one of litigation, and that the negotiations regarding the original contract were at an end.  That Rome merely "remain[ed] hopeful that [TA would] hear from [the Seller] on a more productive note" underscores this shift in posture.

---

[29]  Rome's September 6, 2012, email asserted that "until quite recently" TA "believed" that it could "find a [financing] partner that could close under the terms of the contract in order to avoid this controversy."

Luchs's response to Rome's overt threat is telling. After asserting that the Seller had operated "in good faith" throughout negotiations, Luchs informed Rome that he would, as Rome knew, be away the next week,[30] but that if Rome "fel[t] compelled to file suit before [he] return[ed], so be it." This statement cannot be read to confirm a mutual agreement to extend the period of negotiation under TOPA. Rather, Luchs's response can reasonably be read only as an invitation to sue, in effect to "let the chips fall where they may," particularly given Luchs's final words, "so be it."

Our conclusion that no agreement to extend was reached is reinforced by the fact that although Luchs had spoken briefly to his client, the Seller, about Rome's allegations of TOPA violations, Luchs had merely informed Rome that the Seller would "get back to [Luchs]"; Luchs did not imply that negotiations to modify the tenant contract were still open—or even might be. At this point, therefore, Luchs apparently had no authority to keep negotiations alive; the Seller had not agreed on a course of action in response to TA's allegations.

---

[30] Rome's awareness of Luchs's absence suggests that the two had exchanged some communication prior to Rome's September 6, 2012, email. However, as discussed earlier, there is no record evidence of any prior substantive communication between TA and the Seller.

In response, Rome acknowledged that "[o]f course" TA would wait for Luchs to return a week hence, as "dialogue" is preferable to litigation. But Rome's response concerned TA's own threat to sue for what Rome alleged to be TOPA violations; his response was not an acknowledgment of a decision by the Seller to extend the negotiation period. Indeed, not once did the Seller address TA's refusal to close under the January tenant contract, and no further communication between the parties is contained in the record until after the September 10 settlement date had passed.

Furthermore, the email exchange between the parties lacks the hallmarks of what we have previously treated as valid agreements between parties to extend the settlement date for real property.[31] And, even assuming for sake of argument that

---

[31] *See, e.g., Reiman v. International Hosp. Grp., Ltd.*, 614 A.2d 925, 928 (D.C. 1992) (settlement date was extended by mutual agreement to a specific date in the future, and the agreement stated that payment schedule and closing date would be discussed at the settlement); *Landow v. Georgetown-Inland West Corp.*, 454 A.2d 310, 312 (D.C. 1982) (noting that the parties had "executed" a "written 'extension agreement'" that "deferred the settlement date" to a specific date in the future, "in exchange for an additional $80,000" and that a second executed extension agreement "increased the purchase price by an additional $150,000 in exchange for a further extension of the closing date" to a specific point in time); *Drazin v. American Oil Co.*, 395 A.2d 32, 33 (D.C. 1978) (an extension for

(continued . . .)

the email exchange could reasonably be construed to have waived in writing the "time is of the essence" provision in the tenant contract (an issue we need not address), the exchange fails to mention, let alone discuss, any notion of a time limitation on the extension—an omission that is fatal here.[32] TOPA requires that any extension granted by the property owner must be "reasonable."[33] Reasonableness is a concept that requires a relatively precise timetable, grounded in industry norms or standard practice[34]—one that is not unduly distant into the future—in order to assure that the tenants' right to supplant a third-party contract is not inordinately prejudicial to the third-party purchaser and the property owner. It follows that, to assure the required precision, any extension—a word implying both

_____

(. . . continued)

settlement granted by the owner of a piece of real property to appellants consisted of a written letter, explicitly stating that the settlement date was extended from October 1 to October 15, 1976, and that if appellants failed to close on that date, the contract would become null and $10,000 would be retained as liquidated damages).

[32] See decisions in *supra* note 31.

[33] D.C. Code § 42-3404.04.

[34] *Cf. Lenkin-N Ltd. P'ship v. Nace*, 568 A.2d 474, 478 (D.C. 1990) (concluding that the jury could not properly determine, and was forced to speculate, whether a construction delay "was reasonable" when it received "no guidance on whether [the proposed] time frame could be viewed as an industry standard of reasonableness").

a beginning and an end—must be determined prospectively and set forth a finite period; it cannot simply be an open-ended arrangement. In this case, therefore, it was insufficient for TA and the Seller merely to look back from the date of the revised agreement, November 2, 2012—a period of fifty-three days from the earlier settlement date, September 10—and declare the extension "reasonable" within the meaning of the statute based on hindsight, even though the extension may have been reasonable if determined prospectively.[35]

Without doubt, the TOPA provision "allowing extensions of time for negotiation and settlement with the tenant is an integral part" of the Act; and "once a tenant has seized his or her opportunity to act, the landlord [as seller] should be able to afford reasonable extensions of time without worrying that the third party will thwart the tenant by suing the landlord."[36] However, these protections presuppose the existence of an agreement to extend negotiations. Here, at the proverbial last minute—only four days before settlement—TA shifted from a

---

[35] *See Independence Mgmt. Co. v. Anderson & Summers*, *LLC*, 874 A.2d 862, 867 (D.C. 2005) (affirming trial court's ruling that a period of sixty to seventy days to close was reasonable when the original contract provided that settlement was to occur within fifty-five to seventy days in accordance with the time frames contemplated in the [initial] purchase agreement).

[36] *Coburn v. Heggestad*, 817 A.2d 813, 822 (D.C. 2003).

position of negotiation to one of litigation. TA was therefore signaling, by its words and rationale, that negotiations regarding the original contract were at an end. But in announcing this shift, without seeking in the alternative more time to negotiate a mutually agreeable contract, TA failed to take the required steps readily implicit in the statute: a clear agreement to extend negotiations beyond the agreed-upon settlement date and an extension of time that is reasonable—prospectively—and clearly identified by an end date.

Interpreting the email messages as a whole, as we must, and "giving a reasonable, lawful, and effective meaning to all [their] terms,"[37] we cannot say that "a reasonable and fair-minded person in the position of the parties would . . . have thought" that the disputed language in the emails constituted an agreement to waive the September 10, 2012, settlement date and continue negotiations under the initial tenant contract.[38] The objective indicators are that the contract between the Seller and TA terminated when TA advised the Seller on September 6, 2012, that it could not and would not close under the contract, and, in response, the Seller made no overtures to extend discussions on the contract. Accordingly, when the

---

[37] *Independence Mgmt. Co.*, 874 A.2d at 867 (citation omitted).

[38] *Id.* at 867, 869 (citation omitted).

September 10, 2012, settlement date came and went without performance, there was "no extension of the contract[;] there was . . . no meeting of the minds between the parties on a number of material terms"; and thus "there was no contractual relationship existing between the parties."[39] We, therefore, must reverse summary judgment for TA.

## V.  TA's Counterclaim, Cross-Claim, and TOPA

Davis has appealed the trial court's denial of its corresponding motion for summary judgment, to which TA has responded by presenting an alternative ground for granting TA's own motion for summary judgment and thus denying Davis's motion.

### A. Procedural Background

According to a TA litigation memorandum in the trial court (opposing summary judgment for Davis and supporting TA's similar motion), the "genesis of this entire dispute stems from" TA's assertion that the Seller "had violated TOPA."

---

[39] *T St. Dev.*, *LLC v. Dereje & Dereje*, 581 F. Supp. 2d 26, 32 (D.D.C. 2008), *aff'd*, 586 F.3d 6 (D.C. Cir. 2009).

Implicitly, this memorandum was adverting to attorney Rome's email of September 6, 2012, which claimed that the purchase price "far exceed[ed] the market value of the property,"[40] and that the financing terms were "not reasonably acceptable."[41]  It is important to understand, however, that in the trial court— whatever the intention of TA's pleadings—TA never relied on TOPA violations for an affirmative "claim" against the Seller or Davis.[42]  Rather, TA cited them exclusively as a fallback to defeat the Davis motion for summary judgment in case

---

[40] Davis, and initially TA, agreed to pay $7,650,000 for the property.  After litigation commenced, TA argued in the alternative, in both the trial court and now on appeal, that the dramatic purchase price difference of $3,300,000 between the January 12, 2012, tenant contract and the November 2, 2012, "amendment" to that contract—newly pricing the purchase at $4,350,000—demonstrated that the initial offer was "not bona fide," violating § 42-3404.02 (a) of TOPA.

[41] In his September 6, 2012, email to Luchs, Rome complained that the tenant contract required that, "in order to purchase the property at a price approaching market value[,] . . . a buyer must agree to seller financing on particular terms."  These terms, said Rome, which apparently were tailored to the Seller's own estate planning needs, were not "reasonably acceptable" to TA, as required by TOPA, D.C. Code § 42-3404.05 (a), (a-2).

[42] TA's counterclaim against the Seller and its cross-claim against Davis merely incorporate TA's fourth and fifth defenses from its answer to the Seller's complaint.  And not even those defenses expressly mention TOPA. The fourth defense states that the third-party contract with Davis "represents an illegal attempt to deny []TA its lawful rights" and evidences the Seller's "failure . . . to bargain in good faith," making the contract "void *ab initio*."  The fifth defense says that the third-party contract "may not" be enforceable by virtue of "the doctrine of *in pari delicto*."

the court rejected TA's contract argument. The trial court's order granting complete relief—upholding TA's contract, as purportedly amended, without reaching any TOPA issue—makes it clear that no TOPA contention has been litigated with finality.[43]

In reversing the trial court's ruling for TA on its contract argument, we have triggered TA's TOPA argument for the first time on appeal. In the trial court litigation memorandum to which we have referred, TA suggested how the TOPA argument should play out if the trial court itself rejected TA's contract argument, denied TA's motion for summary judgment, and then—in the "alternative"—evaluated TA's TOPA contentions vis-à-vis the Davis summary judgment motion. In that case, TA explained, the court would have to resolve questions of fact inherent in its TOPA contentions. Then, if these questions were "resolved in

---

[43] The only evidence of record manifestly directed at a TOPA claim was a generalized declaration by Ms. Stephanie Mynkonos, TA's Vice President, in which she asserted that "after discussion with numerous potential development partners and consultation with counsel, the TA reluctantly concluded that the terms of the required seller-financing were not reasonably acceptable."

[TA's] favor," the "previous TOPA offer" by Davis "would be void" and the parties, again, would be at square one.[44]

TA now offers that argument for us to consider on appeal. Thus, TA does not assert a basis on this record for granting it summary judgment on the alleged TOPA violations. Rather, in event of reversal, TA asks this court "to remand for a determination of whether [the Seller's] Offer was bona fide, as required by TOPA." As explained below, we decline to do so.

Although TA's request for a remand is premised on the Seller's alleged failure to make a bona fide offer of sale to TA, that request, more directly, is a challenge to Davis's appeal from the trial court's dismissal of its motion for judgment on the pleadings or for summary judgment on its cross-claim against TA. That motion for judgment by Davis presupposes the validity of its third-party contract (essentially incorporated into the Seller's offer to TA) and accordingly challenges TA's TOPA contentions against the Seller (reflected in TA's cross-

---

[44] The TA memorandum went further to suggest that once the initial third-party offer had been declared void, the Seller "would be required to issue a new offer," and "TA would be required to accept that offer and settle under the terms of the" original tenant contract, "as amended by the Contract Amendment" of November 2, 2012, leaving Davis with "no claim." We take no position on such speculation.

claim against Davis).[45]

Procedurally, TA's TOPA contentions do not reach this court easily. As explained earlier, the scope of the trial court's grant of summary judgment for TA, with its corresponding dismissal of Davis's cross-claim against TA, was limited by the court's conclusion that TA's tenant contract, as amended, was entitled to priority over Davis's third-party contract. In light of our rejection of those rulings, therefore, the question becomes, as TA itself acknowledges, whether TA's "alternative" TOPA allegations and proffers—which the trial court did not address—have created genuine issues of material fact that foreclose summary judgment for Davis despite our ruling in its favor on TA's contract argument.

Given TA's cryptic "notice" pleading,[46] it is not entirely clear that the TOPA contentions asserted here are reflected in TA's answer and cross-claim against

---

[45] As indicated earlier, both TA and Davis filed counterclaims against the Seller, in addition to cross-claims against each other. The Seller, however, took no position on this appeal. Nonetheless, TA's TOPA contentions implicate the Seller as well as Davis and thus implicitly question the trial court's denial of TA's counterclaim. For the sake of convenience, however, we focus exclusively on the Davis cross-claim, as our disposition of it resolves any lingering issue concerning the counterclaim against the Seller.

[46] See *supra* note 42.

Davis (or counterclaim against the Seller).[47]   Nor are we entirely sure, absent protective cross-appeals,[48] that TA has preserved its TOPA challenges against the Seller and Davis.  We shall assume, however, the filing of all essential pleadings and address the merits.

We do so despite the fact that the trial court, in denying summary judgment for Davis under TA's contract theory, did not go further to rule on the merits of TA's TOPA contentions.   Ordinarily, we would remand for the trial court to resolve the matter in the first instance, but we reject that course.  Our review of summary judgment is *de novo*, and as TA claims no basis for augmenting the record at this point (discovery having been closed), the trial court could add

---

[47]  *See Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (adopting the "plausibility" pleading standard articulated by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)); *see also Grimes v. District of Columbia*, 89 A.3d 107, 112 (D.C. 2014) (internal quotation marks omitted) (noting that to survive a motion to dismiss or a motion for judgment on the pleadings, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face").

[48]  *See Hartman v. Duffey*, 19 F.3d 1459, 1465 (D.C. Cir. 1994) (although "[a] party who receives all that he sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it," that party may file a "purely protective . . . cross appeal" in order to "insure that any errors against his interests are reviewed so that if the main appeal results in modification of the judgment his grievances will be determined as well").

nothing to which we might owe deference in conducting our own review; judicial economy would be thwarted by redundant review of this record on the TOPA contentions, assuming, as we do, that the losing party after a trial court remand would bring still another appeal of this matter.

We, therefore, turn to TA's insistence that there are genuine issues of material fact inherent in the record as to whether the Seller (allegedly implicating Davis) violated TOPA when it presented the tenants in July of 2011 with the third-party contract allegedly showing (1) a price far in excess of the property's fair market value and (2) seller-financing terms that were not "reasonably acceptable."[49]  TA argues that these claims are "inherently questions of fact" and cannot be resolved by this court.  We are not persuaded.

## B.  Purchase Price

Should any "material factual issues" remain with respect to TA's claims,

---

[49]  D.C. Code § 42-3404.05 (a), (a-2).

then a remand for further proceedings would be necessary,[50] but summary judgment may not be "avoided merely by demonstrating a disputed factual issue."[51] "Rather, the opposing party must show that the fact is material and 'that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[52] We conclude that TA has failed to produce evidence sufficient to satisfy that test.

We first address TA's claim that the purchase price for the property in the initial tenant contract (derived from the third-party contract) manifested the Seller's failure to bargain in good faith in violation of TOPA. Under TOPA, a property owner's "failure . . . to offer the tenant a price . . . at least as favorable as that offered to a third party[,] . . . without a reasonable justification for doing so," constitutes bad faith.[53] Ordinarily, a "claim of bad faith bargaining . . . presents an

---

[50] *West End Tenants Ass'n v. George Washington Univ.*, 640 A.2d 718, 725 (D.C. 1994) (citations omitted).

[51] *Id.* (citation omitted).

[52] *Id*. (quoting *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C. 1979)).

[53] D.C. Code § 42-3404.05 (a)(1), (2).

issue of mental state somewhat akin to disputes in which intent is at issue";[54] and, given the often subjective nature of determining one's mental state,[55] "summary judgment should be granted sparingly" on that ground.[56] The record before us, however, does not "sufficiently put[] into controversy the issue of [the Seller's] good faith to preclude summary judgment."[57]

The Seller and Davis agreed to a sale price of $7,650,000 for the property. Consistent with TOPA,[58] the Seller then presented an identical copy of the third-party contract to TA. TA proceeded to make hand-written alterations, striking provisions that were unacceptable to it—but not the price.[59] Thus, in January

---

[54] *Green v. Gibson*, 613 A.2d 361, 364 (D.C. 1992).

[55] *See Owens v. United States*, 90 A.3d 1118, 1122 (D.C. 2014) (citation omitted) (noting that in the criminal context, the requisite mental state to support a conviction for receiving stolen property is a "subjective one," and that the "task of discerning a defendant's knowledge . . . usually requires a jury to rely on reasonable inferences rather than direct proof").

[56] *Id.* (quoting *Richardson v. District of Columbia*, 522 A.2d 1295, 1299 (D.C. 1987) (Terry, J., concurring)).

[57] *Green*, 613 A.2d at 364-65.

[58] See *supra* note 53 and accompanying text.

[59] See *supra* note 5.

2012, TA and the Seller came to an agreement on all material terms, including the purchase price of $7,650,000. TA then proceeded to wait for a period of eight months before it first alleged that the Seller had violated TOPA because "[t]he purchase price . . . far exceeds the market value of the property, and constitutes a failure to bargain in good faith."

We assume (without deciding) that TOPA would not preclude a tenants association from negotiating a reduction in the initial purchase price, based on data which the seller agreed would justify a lower price. TA, however, has never disclosed when it first perceived an unfair price or the circumstances that revealed it. Moreover, TA's argument here appears to be premised *not* on discovery of a flawed price later on, but on an excessive price from the beginning. TA merely argues that the dramatic purchase price difference of $3,300,000 between the January 12, 2012, tenant contract and the November 2, 2012, "amendment" to that agreement inherently demonstrates that the Seller's initial offer was not bona fide. But TA has not pointed to any judicial authority to support its argument that TOPA required the Seller, under the circumstances, to sell the property to TA at a lower price than Davis had already agreed to pay—a result that would force the Seller to accept less than it otherwise would have received in the open market. The plain

language of TOPA mandates that the owner of property for sale offer it to the tenants at a price and on terms "as favorable" as its offer to a third party.[60] Nothing more, and nothing less. Here, the Seller has done so; the exact terms of the third-party purchaser contract were presented to TA, price included. Absent evidence to the contrary, therefore, the Seller's identical price for TA, consistent with TOPA, is prima facie evidence of good faith.

It is conceivable, of course, apropos of TA's argument, that an owner could conspire with a third party to set a price in excess of the property's fair market value, and couple it with seller-financing requirements likely impossible for the tenants to match, as ways of assuring that the third party could almost certainly escape a tenant effort to assert TOPA rights. But neither TA's pleadings nor the record itself proffers any evidence to support such nefarious behavior here—not even indirect evidence indicative of the real estate market for such properties in the area of the District that might have put the initial price in question.[61] Although TA

---

[60] D.C. Code § 42-3404.05 (a)(1).

[61] *See Vessels v. District of Columbia*, 531 A.2d 1016, 1019 n.9 (D.C. 1987) (citation omitted) ("The mere existence of some *alleged* factual dispute between the parties" is not sufficient to avoid summary judgment, which must be granted unless there is a "*genuine* issue of *material* fact.").

alleged that "[t]he totality of the contract is indicative of an intent on behalf of the Seller . . . to circumvent the rights of the TA under TOPA," this assertion is not supported by evidence of record,[62] and thus fails to create a "genuine issue of material fact."

## C. Financing Terms

According to D.C. Code § 42-3404.05 (a-2), "[t]he owner may not require the tenant to pay the purchase price in installments unless the owner provides deferred purchase money financing on terms reasonably acceptable to the tenant." Under the tenant contract, however, reflecting the third-party contract, TA was not "required" to pay by installment; TA had two options: paying the purchase price up front, in cash, or over time, in installments financed by the Seller. According to attorney Rome's email of September 6, 2012, to the Seller's attorney, Richard Luchs, TA appears to have eventually elected the seller-financed, installment alternative.

---

[62] In its Answer to Davis's cross-claim, TA asserted as a defense that the third-party contract "represent[ed] an illegal attempt to deny [TA] its lawful rights, is evidence of the failure of [the Seller] to bargain in good faith at that time, is void *ab initio*, and unenforceable." TA, however, failed to proffer evidence to support these allegations.

Rome's September 6 email then notes a "requirement in the [tenant] contract that in order to purchase the property at a price approaching market value, i.e[.] 4.25 M,[63] a buyer must agree to seller financing on particular terms," and alleges in the language of TOPA that the tenant contract "requires terms not 'reasonably acceptable' to the TA." This argument, however, ignores the fact that TA accepted the terms of the third-party contract that provided for two financing options. Contrary to Rome's allegation, the tenant contract did not "*require* the tenant to pay the purchase price in installments" (emphasis added).

Davis, however, does not argue that the word "require," as such, is enough to nix TA's challenge to the seller-financing provision, and without further briefing we would not venture an opinion as to whether, under a two-option contract, a tenants' association would automatically be foreclosed under TOPA from

---

[63] This inclusion of a $4.25 million purchase price (or market value) in alleging a TOPA financing violation is perplexing. The email at the time acknowledged that the purchase price in the tenant contract was $7.65 million. Did Rome intend to suggest that the terms of seller-financing would not be "reasonably acceptable" to TA whatever the purchase price turned out to be?

challenging the reasonableness of the installment alternative.[64] We find it sufficient to say that, in proffering its reasons why the seller-financing terms are not "reasonably acceptable," TA falls short.

In support of its argument, TA lodged in the record a declaration filed by Ms. Stephanie Mynkonos, TA's Vice President, in which she asserted that after "discussions with numerous potential development partners and consultation with counsel, the TA reluctantly concluded that the terms of the required seller-financing were not reasonably acceptable . . . ."[65] Beyond this generalized grievance, however, TA has not specified which elements of the financing requirements were not "reasonably acceptable," including the rationale in support of that contention. Nor did Rome explain how, if at all, the seller-financing terms

---

[64] Attorney Rome appears to be interpreting D.C. Code § 42-3404.05 (a-2) to say that *if TA elects an installment purchase*, the "owner may not require the tenant [association] to pay the purchase price in installments unless the owner provides deferred purchase money financing on terms reasonably acceptable to the tenant." That understanding may seem strained, although it is not conclusively flawed, if only because it would be the unusual owner-seller—one not likely to have received special legislative attention—who would require seller-financing without permitting an all-cash, up-front payment.

[65] See *supra* note 43.

would materially vary depending on the final purchase price.[66] Rome's September 6, 2012, email to attorney Luchs complained that the seller-financing terms were tailored to the Seller's own estate planning needs, but TA never articulated why those financing stipulations were not "reasonably acceptable."[67] TA has never pointed out the terms it found objectionable, or how the Seller failed to address TA's concerns, let alone proffered evidence—through discovery or otherwise—of alleged overreaching. These deficiencies compel a conclusion that TA's allegation of unacceptable financing terms is conclusory, and thus lacks the specificity necessary to withstand Davis's motion for summary judgment.

---

[66] See *supra* note 63.

[67] In his email, Rome voiced concern about the structure of the transaction: "When we have discussed [seller-financing], you have repeatedly told me that the Seller has structured the transaction in this manner for 'estate planning' purposes. For purposes of settlement and compromise, I have taken that at face value, and have offered to discuss the Seller's needs in good faith and to attempt to arrive at an accommodation that would achieve the same purpose. I understand the Seller has flatly refused. That offer remains open at any time, but the refusal to negotiate is indicative of the Seller's true intent." This concern, however, was not explained in the record.

## D. Summary

The Seller presented TA with an exact copy of the third-party contract signed by Davis. TA then made amendments, by hand, while agreeing to all material terms, price and financing included. The parties signed the tenant contract. TA and the Seller operated under this agreement for a period of eight months while TA attempted to find a partner to finance the purchase. Then, only four days before settlement, TA undertook an about-face and declared the purchase price excessive and the seller-financing terms not "reasonably acceptable." Absent more specific factual allegations with proffered evidence in support, we cannot conclude that the record before us "sufficiently puts into controversy" whether the Seller's offered price and terms of financing violated TOPA.[68]

## VI. Conclusion

We have been mindful that TOPA "is to be generously construed 'toward the end of strengthening the legal rights of tenants or tenant organization[s] to the

---

[68] *Green*, 613 A.2d at 364-65.

maximum extent permitted under law.'"[69]   For the foregoing reasons, however, we believe that stretching this statutory generosity to preclude summary judgment for Davis here would "unduly interfer[e]" with Davis's right to fair treatment.[70]   We conclude that the tenant contract lapsed because TA failed to settle or negotiate a reasonable extension of the settlement date; that TA has failed to allege with sufficient specificity and related evidence that the Seller violated TOPA; and that Davis's third-party contract was therefore restored to its priority over the tenant contract.  We reverse the trial court's grant of summary judgment for TA, reverse the court's denial of summary judgment for Davis, and remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

[69]   *Richman Towers Tenants' Ass'n*, 17 A.3d at 601 (quoting D.C. Code § 42-3405.11).

[70]   *Linen*, 945 A.2d at 1177-78 (quoting D.C. Code § 42-3401.02 (1)).